[Cite as *Montgomery v. ExchangeBase, L.L.C.*, 2024-Ohio-2585.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

MIRANDA MONTGOMERY,                   :

    Plaintiff-Appellant,           :            No. 113401

    v.                             :

EXCHANGEBASE, LLC, ET AL.,             :

    Defendants-Appellees.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 3, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-966833

---

### *Appearances:*

Kaufman, Drozdowski & Grendell, LLC and Evan T. Byron, *for appellant.*

Fadel & Beyer, LLC, Timothy R. Fadel, and Nicholas A. Boggs, *for appellees.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Plaintiff-appellant, Miranda Montgomery, appeals from the trial court's order granting summary judgment in favor defendants-appellees, ExchangeBase, LLC ("ExchangeBase"), Alex Kowalski and RiverCap Holdings, LLC ("RiverCap") (collectively, "appellees"), on her claims for disparate treatment, sex

discrimination, hostile work environment, constructive discharge, violation of public policy and intentional infliction of emotional distress. Montgomery contends that the trial court erred (1) in refusing to consider certain evidence she submitted in opposition to appellees' motion for summary judgment and (2) in granting summary judgment in appellees' favor on her claims. She asserts that, when reviewing all the evidence, reasonable minds could differ as to whether appellees subjected her to "such pervasive gender/sex-based disparate treatment and [a] hostile work environment" that any reasonable person in her position would have felt "compelled to resign" and that summary judgment was, therefore, "not warranted."

{¶ 2} For the reasons that follow, we affirm.

## I. Procedural and Factual Background

### A. Montgomery's Employment by ExchangeBase

{¶ 3} ExchangeBase manages a network of energy assets and connects buyers and sellers of products, equipment and services in the oil, gas and energy industries. RiverCap is the parent company of ExchangeBase. Kowalski is the president, chief operating officer and majority owner of ExchangeBase and RiverCap.

{¶ 4} In October 2017, ExchangeBase hired Montgomery as one of several senior project managers in its oil and gas division. As a senior project manager, Montgomery managed projects for oil and gas companies that were clients or customers of ExchangeBase. Montgomery joined the company at the same time as

two other senior project managers, Amy Bakos and Jeff Cool. They joined three existing senior project managers, Brian Matthews, Jon Bok and Tom Sheridan. Montgomery's compensation, like that of all of the senior project managers, included a base salary and commissions. Sheridan was initially Montgomery's direct supervisor.

{¶ 5} When Montgomery began her employment at ExchangeBase, her compensation was $70,000/year salary plus 3 percent commission on the gross margin of deals she closed. In September 2018, Montgomery's base salary increased to $100,000/year. Approximately two months later, the company agreed that Montgomery could work from home and her compensation was changed to a salary of $70,000/year plus 8 percent commission. Montgomery's base salary later increased to $85,000/year.

{¶ 6} In March 2019, Kowalski assumed direct management of the senior project managers and became Montgomery's direct supervisor. He indicated that employees were no longer permitted to work from home and that "the option was off the table for everybody moving forward."

{¶ 7} At approximately 7:30 p.m. on April 4, 2019, Kowalski sent a text message to Montgomery and two other senior project managers, Matthews and Johnny Donofrio, communicating his displeasure that customers were being contacted by email instead of by telephone and indicating he had scheduled a meeting for 9:45 a.m. the next morning to discuss the issue. Upon receiving the text, the two other senior project managers called Kowalski. Montgomery did not. She

testified that she was asleep when the text was sent and that when she woke up at 10:00 p.m. and saw the text, she "didn't see a reason" to call Kowalski because a meeting was already scheduled for the following morning.

{¶ 8} At the meeting on April 5, 2019, Kowalski thanked Matthews and Donofrio for being "respectful" and contacting him after receiving his text message. He told Montgomery that her failure to call him was disrespectful and "f****** foolish." She testified:

> [Kowalski] looked at me and said, "Miranda, there's no reason why you didn't call me. I don't know why the f*** you wouldn't call me." He wanted me to explain to him why I didn't call him. He was very aggressive and said that it was f****** foolish for me not to have called him and that the only two respectful people in the room were Johnny and Brian; and that if I had respect or any f****** sense, that I would have called him the night before when I received the text message. I told him that I didn't see any reason to call. The text did not say "call me," and that's why I didn't call. So he told me that I was a f****** fool one more time before moving on . . . .

{¶ 9} Kowalski testified that he thought Montgomery's failure to call him after receiving his April 4, 2019 text was "disrespectful" and "f****** foolish" and that he conveyed this and his "anger at them" to Montgomery and the other senior project managers during the April 5, 2019 meeting.

{¶ 10} Montgomery stated that it was a "common occurrence" for Kowalski to use the term "f***" in the office in a "[l]ike casual" way, e.g., during "a group lunch or something like that," but that April 5, 2019 was the first time he had directed the term towards her in what she perceived was "a very derogatory way." Montgomery testified that she did not perceive Kowalski's use of the term as being "sexual" but

that his tone and language were "inappropriate." She indicated that she did not believe Kowalski had a right to be angry with her, that she was "embarrassed" and "upset" for being "singled out" in front of her coworkers for failing to call Kowalski after receiving his text message and that it was a "difficult day" for her "emotionally and physically." She stated that after the meeting, she, Matthews and Donofrio had a conversation where they discussed "being dissatisfied with [Kowalski's] anger, disagreeing with his anger, and just kind of being shocked at the way the meeting went."

{¶ 11} On April 9, 2019, Montgomery received an email from a client who wished to procure a specific piece of equipment. Montgomery stated that she was unfamiliar with the equipment and did not know what her "next step" should be, so she asked another employee, Jim Klosz, ExchangeBase/RiverCap's former managing director of strategic growth, what she should do. Klosz told Montgomery he would attempt to get answers to her questions. Later that day, Klosz relayed Montgomery's questions to Kowalski. In response, Kowalski told Klosz that if he were Klosz and Montgomery had asked him the questions she had asked Klosz, he would have told her to "go f*** herself."

{¶ 12} Kowalski related the conversation he had had with Klosz regarding Montgomery to Montgomery, Donofrio, Matthews and Klosz during a meeting with them the following day. Montgomery testified:

> So I go into the meeting on April 10th assuming we're just going to discuss work flow and protocol of what to do with projects when we receive them. . . . So the meeting began, and Alex started out and said

— he said, "I'm going to give everybody a little behind the scenes look at a conversation that I had with Jim yesterday." He said, "Jim came to me with a question that Miranda had, and it was a question that she should have known the answer to." He said, "Do you all know what I said to Jim?" He said, "I'm going to tell you what I said to Jim. I told Jim to tell Miranda to go f*** herself." And he looked at me very strongly when he made that statement. From that point he explained that there was no reason I didn't know the answer to that question.

{¶ 13} According to Montgomery, Kowalski went on to state that, given how much they were paid, he believed his employees "should be held to higher standards" and "should not be stupid and ask like stupid questions."

{¶ 14} Kowalski testified that he told Klosz that if Montgomery had asked him the questions she had asked Klosz, he would have told her to "go f*** herself" because, in his view, Montgomery was "seeking to have Jim Klosz answer questions on a project for which she should have known the answers or taken the initiative to find the answers to her questions," improperly shifting the burden of answering her questions onto Klosz. He explained that he shared his conversation with Klosz with the group because he considered this "a teaching opportunity to emphasize the need for self-motivation and problem solving among all Senior Project Managers." He claimed that during the meeting Montgomery "became enraged, began yelling and cursing, quit her job, then told me that I should go f*** myself, among other things." Donofrio offered similar testimony. He testified that after Kowalski repeated his conversation with Klosz, Montgomery said: "[T]ake my salary, give it to someone else and you can go f*** yourself. I am going to get my purse and leave. I am not going to deal with you anymore. I'll tell HR that you told me to go f*** myself."

{¶ 15} Montgomery testified that after Kowalski related his conversation with Klosz to the group, it took her "about 30 seconds to make the decision" to terminate her employment with ExchangeBase. She explained:

> I was so physically uncomfortable in that room with those men knowing that they had had a private conversation having me — having me as the topic and telling me to go f*** myself. To go f*** myself. I was completely alone. I was the only female in the room. And knowing, number one, that that conversation was had about me in private, like it makes me feel disgusting, and it makes me feel like uncomfortable in that workplace. . . . And the second part of it was having it to be like a display at the meeting, again in front of my male co-workers, to me it very clear that he wanted me to f*** myself. I didn't feel like I had a choice because I couldn't physically be in that environment anymore and know that I was being talked about in a sexual way behind my back and then to have it rediscussed all at the meeting all for asking a simple question. I had to leave.

She stated that she felt like, in that context, "go f*** yourself," as used by Kowalski, was a "sexual reference."

{¶ 16} Montgomery denied telling Kowalski, during the meeting, that he could "go f*** himself" but stated that she was "a mess," "in tears, shaking, emotionally distraught" and "could have" "potentially" made such a statement in the hallway after exiting the meeting. She stated that she did not recall "if [she] used those terms or not." She testified that, after gathering her belongings from her office, she told Kowalski, "I will be sure to let HR know that the reason I'm leaving today is because you made me feel uncomfortable with your sexual statements."

{¶ 17} Following the April 10, 2019 meeting, Montgomery submitted a resignation letter to Jacob Brown and Emily Anne Reddy in ExchangeBase's human resources department. In her letter, Montgomery "recapped" the events

surrounding the April 10, 2019 meeting and stated that she was resigning her position because, due to the "verbal abuse and intimidation" she experienced during that meeting, she "no longer [felt] safe in the toxic and verbally threatening work environment at ExchangeBase." Her letter stated:

> May this letter serve as my official resignation from ExchangeBase. Please see below re-cap of the events from today, April 10, 2019 to reflect the reason of my resignation:
>
> . . .
>
> Alex began the meeting by talking about babies, and how we are not babies. He said babies stick their fingers in light sockets and do not know how to flush toilets, and no one at ExchangeBase is a baby.
>
> —He then said that he wanted to give us a little "behind the scene's [sic] look" at a conversation he had yesterday (referring to April 9, 2019) with one of our colleagues, Jim Klosz. He said Jim came to me with a question that Miranda had about one of her projects with Hess. Alex said "Behind the scene's [sic] I looked at Jim and said you know what I would tell Miranda to do Jim? I would tell Miranda TO GO F*** HERSELF"
>
> . . .
>
> After Alex said for me to "GO F*** MYSELF" I gathered my things, stood up in the middle of the meeting and told him I was quitting because I did not have to allow anyone to speak to me that way. I told him I was going to go back to my office, get my purse and personal belongings and immediately exit the building. On my way out I told him that I would be sure to let HR know the reason I am quitting is because he told me to "GO F*** MYSELF."
>
> I gathered my personal belongings, got into the elevator, got into my car, and immediately drove off the premises. I left the workplace because I did not feel comfortable or safe in the workplace any longer. I did not feel comfortable knowing that my President/CEO/Acting Director of Business Development had a private conversation with my colleague Jim Klosz on April 9, 2019 without my knowledge or permission using sexual terms about me.

. . .

Today, April 10, 2019 Alex Kowalski used verbal abuse, and an attempts [sic] to intimidate, which made me feel unsafe and uncomfortable in my workplace.

{¶ 18} Montgomery further stated in her letter that this was not the first time Kowalski had "made [her] feel uncomfortable with his threatening language in the workplace" and described the events of April 4-5, 2019, relating to Kowalski's text message, Montgomery's failure to call him following receipt of his text message and Kowalski's criticism of her, describing her as a "f***ing fool," in front of her colleagues.

{¶ 19} Montgomery claimed that Kowalski's conduct violated provisions of the company's employee handbook that prohibited "[t]hreats, threatening language, or any other acts of aggression or violence made toward or by any employee" and "[v]erbal [b]ullying." According to Montgomery,[1] the handbook defined "threat" to include "any verbal or physical harassment or abuse, attempts to intimidate others, menacing gestures, stalking or any other hostile, aggressive, and or destructive actions taken for the purposes of intimidation" and defined "[v]erbal [b]ullying" as "[s]landering, ridiculing, or maligning a person or his/her family; persistent name calling that is hurtful, insulting, or humiliating; using a person as the butt of jokes; abusive and offensive remarks."

---

[1] The employee handbook is not in the record on appeal.

**{¶ 20}** During her deposition, Montgomery confirmed that the reason she terminated her employment with ExchangeBase was due to the "verbal bullying" she experienced on April 5, 2019 and April 10, 2019: "I quit because Alex had a private conversation with [sic] me in a sexual way with Jim Klosz, and then he reiterated that private sexual conversation in the meeting. Those are the reasons that I quit."

## B. Montgomery Sues Appellees

**{¶ 21}** On September 16, 2019, Montgomery filed a complaint against appellees in the Cuyahoga County Court of Common Pleas, Cuyahoga C.P. No. CV-19-921551 (the "dismissed action"), asserting claims of sex discrimination-hostile work environment, sex discrimination-disparate treatment, constructive discharge, violation of public policy and intentional infliction of emotional distress against appellees. After conducting discovery, appellees filed a motion for summary judgment. Montgomery voluntarily dismissed her complaint without prejudice on August 2, 2021.

**{¶ 22}** On August 1, 2022, Montgomery refiled her complaint in the Cuyahoga County Court of Common Pleas, once again asserting claims of sex discrimination-hostile work environment, sex discrimination-disparate treatment, constructive discharge, violation of public policy and intentional infliction of emotional distress against appellees. The allegations of Montgomery's refiled complaint centered around the April 9 and 10, 2019 incidents and were virtually identical to those of her initial complaint. Montgomery alleged that she had been subjected to "harassment, belittling, and demeaning comments and conduct" by her

direct supervisor Kowalski and that the "harassing conduct" was so "severe and pervasive" that she was "forced to resign." Montgomery further alleged that "similarly situated male employees" at ExchangeBase were "treated better" than her, e.g., that (1) male employees were paid more in compensation despite performing below her level, (2) when a male employee (i.e., Matthews) quit, his pending deals were all given to another male employee and not spread out among Montgomery and other employees, (3) "male employees were not subjected to the ridicule" to which Montgomery was subjected and (4) a former male employee who quit received commissions on deals that closed after his departure, while Montgomery did not. Montgomery claimed that as a result of appellees' intentional, extreme and outrageous conduct, she had suffered "severe" mental anguish, lost wages, loss of reputation, humiliation, embarrassment and loss of self-esteem. Montgomery requested judgment against appellees, jointly and severally, and an award of compensatory and punitive damages, attorney fees and costs.[2]

{¶ 23} On September 29, 2022, appellees filed an answer in which they denied most of the material allegations of the complaint and asserted various defenses.

## C. Appellees' Motion for Summary Judgment

{¶ 24} On May 2, 2023, appellees filed a motion for summary judgment on all of Montgomery's claims. Appellees argued that they were entitled to summary

---

[2] Although Montgomery purportedly attached several exhibits to her complaint, the exhibits are illegible in the copy of the complaint that is in the record.

judgment because there were no genuine issues of material fact and that, based on the undisputed facts, Montgomery could not prove essential elements of her claims against appellees as a matter of law. Specifically, appellees argued that Montgomery's sexual harassment-hostile work environment claim failed because Montgomery could not establish that Kowalski's statements on April 9 and 10, 2019 were based on sex or were sufficiently severe or pervasive to affect the terms, conditions or privileges of employment.

{¶ 25} They argued that Montgomery's other claims failed because (1) Montgomery had no evidence that she was treated worse than male employees or had suffered any adverse employment action because of her gender, (2) Kowalski's "f*** yourself" statement did not "rise to the level of making working conditions so intolerable that a reasonable person would have felt compelled to resign over such a statement" and ExchangeBase was not given "an opportunity to correct the situation," (3) R.C. 4112.02 adequately protects the public policies of sexual harassment, sex discrimination and constructive discharge such that there is "no additional public policy claim to recognize," (4) Kowalski's comments did not constitute "extreme and outrageous conduct" and there was no evidence Montgomery had sustained "severe and debilitation distress" as required to support a claim for intentional infliction of emotional distress and (5) Montgomery had stated no claims upon which liability could be imposed against Kowalski individually.

{¶ 26} In support of their motion, appellees submitted excerpts from the transcript of Montgomery's deposition (taken in the dismissed action), a copy of Montgomery's resignation letter and affidavits from Brian Donahue (the managing director of operations for ExchangeBase/RiverCap), Kowalski and Donofrio.[3]

{¶ 27} In his affidavit, Donahue testified regarding a "spreadsheet of compensation comparisons" for senior project managers during the time Montgomery was employed as a senior project manager for ExchangeBase he had prepared (the "salary spreadsheet"), a copy of which was attached to his affidavit. He averred that compensation packages for senior project managers "typically" included both a salary component and a commission component that varied "depending on factors such as seniority, performance, knowledge, [and] abilities." He denied that Montgomery's compensation package was "based on her sex or gender."[4] He further averred that, following her termination, ExchangeBase paid Montgomery "all outstanding compensation owed" as well as "commission amounts . . . she was not entitled to receive but which were paid as a gesture of good faith to her." He also claimed that during its "normal operations," ExchangeBase employees are "provided very direct feedback, positive and negative, which may often include

---

[3] Appellees also submitted a document purporting to be Klosz's affidavit. That document was not signed or notarized and, therefore, was not considered by the trial court in ruling on summary judgment. We, likewise, do not consider it here.

[4] The record reflects that among the three new hires when Montgomery started at ExchangeBase — Montgomery, Bakos and Cool — Bakos, a female, was paid the highest base salary. As the trial court observed, "very few trends of any type" are otherwise "evident" from the salary spreadsheet.

use of the word 'fuck' or variations of that term," that this is true "for all employees, male or female" and that use of the term "contains no reference to sex, gender, nor innuendo related thereto."

{¶ 28} In his affidavit, Kowalski outlined his view of the events of April 4-5 and 9-10, 2019 and his interactions with Montgomery, Klosz and the other senior project managers on those dates as detailed above. Kowalski also addressed the use of the word "f***," generally, in "the operation of [ExchangeBase's] business and interaction among employees" and his use of the expression "go f*** herself," specifically:

> The word "f***" is a word that is used occasionally in the operation of our business and interaction among employees. When used, it is without regard to sex or gender and is used in circumstances of positive and negative performance uses and feedback, as well as other work-related discussions. The term is not used to refer to sex or libidinal references in the workplace.
>
> . . .
>
> The expression ["go f*** herself"] was not related to sex or gender and, when used, is used regardless of gender among men and women. There was no context during the April 10 meeting that had any reference nor anything to do with sex or gender. It was in connection with what I believed to be a failure of Plaintiff to properly perform her job.

{¶ 29} In their affidavits, Klosz and Donofrio related their recollections of the events of April 9-10, 2019, as detailed above.

{¶ 30} Montgomery opposed the motion. In her opposition, Montgomery asserted that her claims were not limited to the specific allegations set forth in her complaint but included other allegations that she had described in her responses to

discovery requests in the dismissed action and during her deposition in the dismissed action.  Specifically, Montgomery identified ten alleged incidents during her employment at ExchangeBase[5] that she claimed were "discriminatory and hostile":

- Incident 1 — On her first day of training, Bok, a senior project manager who was supposed to be training Montgomery, told her that "they were out celebrating a huge project win the night before," "described that they went to a strip club," "apologized for still being drunk" and ended up going home without training her.  She indicated that her relationship with Bok was "friendly" and "professional" following that "isolated incident."

- Incident 2 — When another senior project manager, Matthews, left the company in the spring of 2018, his three open projects were all given to Bok instead of being distributed among Bok, Bakos and Montgomery — even though they were all senior project managers.  When Montgomery and Bakos raised the issue with Sheridan, Sheridan stated that he had worked with Bok (a male) for an "extensive amount of time" and "trusted him" and that Montgomery and Bakos (both females) hadn't worked with him long enough for him to know they could handle the extra projects.  Montgomery acknowledged that Bok had more experience than her.  (At the time, Montgomery had worked for the company for eight months and had closed one project.)  When Montgomery told Sheridan that she and Bakos were upset because Bok would receive the commissions on those projects, Sheridan informed her that Matthews would be receiving the commissions on the projects.  Montgomery indicated that she was still upset by the unequal distribution of Matthews' projects because Bok would receive any projects from those companies going forward and she felt one of the three projects should be hers.

- Incident 3 — In 2018, once when Montgomery was wearing a "springtime" dress, Kowalski stopped in the middle of a conversation with Sheridan, looked at Montgomery, her chest,

---

[5] The incidents are not in date order.  They are numbered and ordered here as they were numbered and ordered in Montgomery's opposition.

side and legs and said, "Mmm. Looks like you might have lost a little bit of weight, young lady." Montgomery told Sheridan that the interaction with Kowalski had made her uncomfortable. She indicated that Sheridan laughed and said, "[I]t wasn't a big deal. . . . That's how Alex is. He was just being funny. Don't take it personally." Montgomery stated that she did not report the incident to human resources because Kowalski was the "be-all, end-all" in the company and she felt that if she had reported the incident, "it would have resulted in nothing."

- Incidents 4 and 6[6] — Sheridan once directed Montgomery to use her "sweet southern charm" to "sweet talk" a supplier into settling an invoice by placing a wine order at a liquor store for pick up by Sheridan. Although Sheridan reportedly did this "all the time," Montgomery claimed Sheridan's actions were discriminatory because he "never told a male employee to use their sweet voice to another male client in order to receive a wine payment from the liquor store."

- Incident 5 — Sheridan announced at a meeting on a Friday afternoon, which "might have included the entire sales team and entire supply chain team," that the company had an opening for a director of business development. He stated that the position was "open to anyone," to "take the weekend to think about it" and "let us know if you're interested." Montgomery was interested in the position and planned to think about it over the weekend. On Sunday afternoon, Sheridan informed her that another project manager, Logan Stetzer, who had been hired after her, had been offered and accepted the position. When Montgomery told Sheridan she had been interested in the position but had been thinking about it over the weekend as suggested, Sheridan replied that she "should have been more like Logan and grabbed the bull by the horns and expressed [her] interest." Sheridan told her that Stetzer had come up to him after the meeting, told Sheridan that he was extremely interested in the position, interviewed and presented a slide show for the position on Saturday and was hired for the position on Sunday. According to Montgomery, Stetzer lacked sufficient experience for the position and she and another project manager, Dan

---

[6] It is not clear from Montgomery's opposition why this incident is deemed two separate incidents. It appears to a relate to a single incident.

Pfeiler, bonded over the "secret" hiring and failure of Stetzer in the position.

- Incident 7 — Because there was no mention of maternity leave in the employee handbook, Montgomery asked Sheridan if she would receive maternity leave if she became pregnant. Sheridan responded, "Yeah. I would give you some time off, obviously." Upon further inquiry about what would happen to her accounts when she came back from maternity leave, Sheridan explained that "taking off extensive amounts of time from this specific job would not lead [Montgomery] to be successful." Referencing other successful project managers, Sheridan queried: "Are any of those people mothers? . . . Have any of those people taken maternity leave? . . . You just have to think smart."

- Incident 8 — On Montgomery's first day of work at ExchangeBase, as the three new project managers — Montgomery, Bakos and Cool — were being split up to receive training and learn about the company, Sheridan said to Cool, a male, "You're sitting with me today. We're going to make sure you get the first project and show these women how the work here is done." Although the project managers got projects on their own and all of the project managers got projects, Montgomery claimed that the statement was discriminatory because it implied that "the male is more likely to get the first project versus the female," i.e., that "Tom felt that as Jack [was] a male, he had a greater ability and a higher chance of receiving the first project as opposed to Amy and I receiving the first projects because of our gender."

- Incident 9 — Montgomery claimed to have had conversations with three male senior project managers (Matthews, Dan Pfeiler and "Jeff") in which they claimed to be making a larger base salary than Montgomery was making at the time.

- Incident 10 — "The Final Straw (April 2019)" "detailed in the Complaint [and] in Ms. Montgomery's deposition."

{¶ 31} As evidence of these alleged incidents, Montgomery cut and pasted large chunks of testimony from her deposition with little discussion, explanation or argument. Montgomery claimed that the court was "required to look at the

cumulative facts and circumstances of [Montgomery's] entire employment with ExchangeBase" in determining whether Montgomery was "not constructively discharged as a matter of law" and that "her complete deposition testimony establishes that her case must go to a jury."

{¶ 32} In her opposition, Montgomery did not address the specific elements of her claims for sex discrimination-hostile work environment and sex discrimination-disparate treatment and did not show how the evidence she presented could satisfy those elements. She merely identified what was generally required to establish constructive discharge, i.e., that an employer's conduct resulted in working conditions that were so intolerable a reasonable person would have felt compelled to resign under the circumstances, and then, in a conclusory manner, asserted that "[a] reasonable jury could easily decide, based on all the facts and circumstances, that Ms. Montgomery had no choice but to resign and that the intolerable work conditions she endured were all premised on her sex/gender."

{¶ 33} Montgomery did not mention her violation of public policy claim in her opposition and, with respect to her claim for intentional infliction of emotional distress and her attempt to impose individual liability on Kowalski, stated only: "The Court is well versed on the elements of intentional infliction of emotional distress and on individual employer [sic] liability. Ms. Montgomery respectfully submits that this brief also establishes that summary judgment is not appropriate on either of those claims as well." In support of her opposition, Montgomery attached copies of (1) the transcript of her deposition in the dismissed action, (2) correspondence

from appellant's counsel to appellees' counsel requesting that the parties agree to extend the discovery deadline, that the parties stipulate that discovery from the dismissed action be used in the refiled action[7] and that appellees address certain alleged deficiencies in their responses to requests for production in the dismissed action, (3) the salary spreadsheet attached to Donahue's affidavit and (4) Montgomery's responses to appellees' discovery requests in the dismissed action.

{¶ 34} Appellees filed a reply in which they objected to Montgomery's attempt to identify new "incidents" to support her claim of constructive discharge that had not been alleged in the complaint. They argued that Montgomery was "limited to the allegations of her pleading" and could not "enlarge her claims" in defense of their summary judgment motion. They further argued that, based on the lack of argument and analysis in her opposition, Montgomery had failed to meet her burden under Civ.R. 56(C), i.e., that Montgomery had failed to present evidence of specific facts demonstrating a genuine issue for trial as to any of her claims.

## D. The Trial Court's Ruling on Summary Judgment

{¶ 35} On October 23, 2023, the trial court granted appellees' motion for summary judgment. Citing *Wolk v. Paino*, 2011-Ohio-1065, ¶ 36 (8th Dist.), and *Karsnak v. Chess Fin. Corp.*, 2012-Ohio-1359, ¶ 48 (8th Dist.), the trial court stated that Montgomery's claims could not be "enlarge[d]" on summary judgment "by adding factual matters not pleaded in the complaint" and determined that it could

---

[7] There is no indication in the record that the parties agreed to such a stipulation.

not consider alleged Incidents 1, 4, 5, 6, 7 or 8 in ruling on appellees' motion for summary judgment because these incidents were "not alleged or referenced in the complaint at all" and the allegations of the complaint were otherwise "insufficient to put [appellees] on notice that Montgomery was making specific claims about Sheridan and Bok." Reviewing the evidence of the incidents it determined it could properly consider on summary judgment, i.e., Incidents 2, 3, 9 and 10, the trial court granted summary judgment in appellees' favor on all of Montgomery's claims, concluding, in a detailed, well-reasoned opinion, that there were no genuine issues of material fact, that Montgomery could not establish essential elements of her claims against appellees and that appellees were, therefore, entitled to judgment as a matter of law.

{¶ 36} Montgomery appealed, raising the following two assignments of error for review:

> Assignment of Error No. 1
> The trial court committed reversible error by refusing to consider the evidence referenced on page 10 of its October 23, 2023 summary judgment opinion.

> Assignment of Error No. 2
> The trial court committed reversible error by granting Appellees' motion for summary judgment.

## II. Law and Analysis

### A. The Trial Court's Failure to Consider the Evidence Referenced on Page 10 of its Summary Judgment Opinion

{¶ 37} In her first assignment of error, Montgomery contends that the trial court erred in "refusing to consider" "the evidence referenced on page 10 of its October 23, 2023 summary judgment opinion." It is not entirely clearly to what "evidence" Montgomery is referring. Page 10 of the trial court's summary judgment opinion begins in the middle of a paragraph. That paragraph, continued from the prior page, addresses the "ridicule" to which "Montgomery was allegedly subjected" and consists of quotations of allegations from Montgomery's complaint. The trial court states that, "[b]ased on this," i.e., the quoted allegations from Montgomery's complaint, it could consider "the incidents on April 9 and 10" and "Kowalski's comment about Montgomery's weight" but could not consider "the allegations about John Bok," "any alleged statements from Tom Sheridan regarding 'southern charm' or maternity leave" or "Montgomery's testimony regarding Sheridan assigning a project to 'show women how it works'" because "[t]hese events" were not alleged or "alluded to" in Montgomery's complaint. Page 10 ends with a quotation from R.C. 4112.02(A).

{¶ 38} App.R. 16(A)(7) requires an appellant to include in her brief "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on

which appellant relies."  The Rules of Appellate Procedure do not permit parties to "incorporate by reference" arguments from other sources.  *See, e.g., Barry v. White*, 2023-Ohio-1570, ¶ 11 (8th Dist.); *Curtin v. Mabin*, 2008-Ohio-2040, ¶ 9 (8th Dist.). Appellate courts are not "'obligated to search the record or formulate legal arguments on behalf of the parties.'"  *Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife*, 2015-Ohio-3731, ¶ 28, quoting *State v. Quarterman*, 2014-Ohio-4034*, ¶ 19; see also Strauss v. Strauss*, 2011-Ohio-3831, ¶ 72 (8th Dist.) (If an argument exists to support an assignment of error, "'it is not this court's duty to root it out.'"), quoting *Cardone v. Cardone*, 1998 Ohio App. LEXIS 2028, *22 (9th Dist. May 6, 1998).  We may disregard an assignment of error presented for review if the appellant fails to comply with App.R. 16(A).  *See* App.R. 12(A)(2).  Accordingly, for this reason alone, we could overrule Montgomery's first assignment of error.

{¶ 39} Even if we were to consider Montgomery's first assignment of error and interpret it as challenging the trial court's refusal to consider evidence of Incidents 1 and 4-8 described above, we would find no reversible error here.

{¶ 40} Montgomery does not dispute that she presented evidence of additional incidents of alleged discrimination in her opposition to summary judgment that were not alleged in her complaint.

{¶ 41} She contends, however,  that because appellees served interrogatories in the dismissed action in which they asked Montgomery to describe "any conduct" by appellees that she "claim[ed]" was "discriminatory" and questioned her about her answers to those interrogatories during her deposition in the dismissed action,

appellees were "on notice" of "the allegations underlying [her] claims" and the trial court "committed reversible error" by relying on *Wolk,* 2011-Ohio-1065, and *Karsnak,* 2012-Ohio-1359, and "refusing to consider some of [Montgomery's] key evidence" when ruling on appellees' motion for summary judgment. Montgomery has cited no legal authority supporting this proposition.[8]

{¶ 42} Appellees respond that if Montgomery wished to assert these allegations as additional grounds for recovery on her claims, she needed to amend her complaint to include them, and that, she failed to do so, and, instead, "filed the

---

[8] The only case Montgomery cites in support of her first assignment of error is *A-M.R. v. Columbus City School Dist.*, 2015-Ohio-3781 (10th Dist.). Montgomery does not explain why she contends this case applies; she simply asks this court to "consider the following" quote from that case:

> Civ.R. 56(C) places a mandatory duty on a trial court to thoroughly examine all appropriate materials filed by the parties before ruling on a motion for summary judgment. The failure of a trial court to comply with this requirement constitutes reversible error. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 604 N.E.2d 138 (1992), paragraph one of the syllabus. More explicitly, when "a court has failed to consider a deposition properly before it in rendering summary judgment it commits error which is, per se, prejudicial and renders the judgment erroneous as a matter of law." *Kramer v. Brookwood Retirement Community*, 1st Dist. Hamilton No. C-920182 (Aug. 4, 1993).

*A-M.R.* at ¶ 15. In that case, the trial court failed, without explanation, to consider the deposition testimony and other materials submitted by the plaintiff with her opposition to summary judgment and, instead, referred only to the allegations of plaintiff's complaint when analyzing the facts relevant to the defendant's motion for summary judgment. *Id.* at ¶ 15, 17. The court held that because "[t]he trial court in its decision evinced no information that it had considered [the plaintiff's] evidentiary submissions" and did not provide "a valid justification for failing to consider that evidence," the trial court had erred in determining that there was no evidence of a defect and granting summary judgment in favor of the defendant on the plaintiff's claim for injuries resulting from a shattered glass door. *Id.* at ¶ 19, 22. There was no claim in that case that the plaintiff, in opposing summary judgment, sought to expand her claims beyond those asserted in her complaint. Likewise, there is no claim here that the trial court, without explanation, failed to consider any evidence Montgomery submitted with her opposition to summary judgment.

exact same Complaint" as she had filed in the original case. As such, appellees maintain, "Montgomery is limited to the allegations of her complaint" and the trial court properly limited its consideration of her discrimination claims to the allegations set forth in her complaint.

{¶ 43} In *Wolk*, the plaintiffs purchased a home but waived the right to obtain a prepurchase home inspection. *Wolk* at ¶ 5. They subsequently discovered substantial mold and water intrusion in the home and brought a breach of fiduciary duty claim against the defendant realtor. *Id.* at ¶ 6-7. In their complaint, the plaintiffs alleged that the defendant breached her fiduciary duty by failing to direct the plaintiffs to obtain a home inspection. *Id.* at ¶ 7. In their brief in opposition to the defendant's motion for summary judgment, however, the plaintiffs attempted to assert additional ways in which the defendant allegedly breached her fiduciary duty. *Id.* at ¶ 37.

{¶ 44} On appeal of the trial court's ruling granting summary judgment in favor of the defendant, the plaintiffs argued that the trial court had erred in limiting its review to the plaintiffs' allegation that the defendant should not have allowed them to waive the home inspection. *Id.* at ¶ 35. This court disagreed. This court explained:

> A plaintiff is required to set forth a short and plain statement showing she is entitled to relief. Civ.R. 8(A). The purpose of notice pleading is to notify a defendant of the allegations against him so that he might prepare a defense thereon. In their complaint, appellants narrowly limited their cause of action to the allegation that [the defendant] breached her duty by allowing [appellants] to waive the inspection. By making the allegations in the complaint so specific,

appellees were not put on notice of any other alleged breaches. Generally, a plaintiff cannot enlarge her claims during a defense to a summary judgment motion and is limited to the allegations of her pleading.

Here, appellants specifically alleged in their complaint that the breach of fiduciary duty resulted from [the defendant's] "failure to fulfill her duties . . . by not having inspections completed to fully review the conditions of the house that would have resulted in discovering mold and other conditions that were defects in the property." . . . We find that appellants are limited to the allegations of their complaint. They had the opportunity to amend their complaint and failed to [do] so in accordance with the civil rules. As such, appellees were not properly put on notice of these additional allegations.

*Id.* at ¶ 36-38.

{¶ 45} In *Karsnak*, 2012-Ohio-1359, the plaintiff filed suit against her former employer, asserting various claims, including a claim for retaliatory discharge. *Id.* at ¶ 9. In her complaint, the plaintiff alleged that the employer had unlawfully terminated her in retaliation for filing a claim with the Equal Employment Opportunity Commission. *Id.* at ¶ 48. In her opposition to summary judgment, the plaintiff argued that the alleged retaliatory termination resulted from her complaining of age discrimination. *Id.* at ¶ 46. On appeal of the trial court's decision granting summary judgment in favor of the employer, this court limited its review of the plaintiff's retaliatory discharge claim to the allegations of the complaint, citing *Wolk*. *Id.* at ¶ 49. The court stated that "[b]y making the allegations in the complaint so specific," the employer was "not put on notice" that the plaintiff would later claim her termination resulted from her age discrimination complaint. *Id.* at ¶ 48. "Generally, a plaintiff cannot enlarge her claims during a

defense to a summary judgment motion and is limited to the allegations of her pleading." *Id.*

{¶ 46} We need not resolve this issue here because even if we were to consider all of the evidence Montgomery submitted in support of her opposition to summary judgment, i.e., her deposition testimony from the dismissed action regarding all ten alleged incidents, she has not shown that the trial court erred in granting appellees' motion for summary judgment.

## B. Montgomery's Claims of Constructive Discharge, Disparate Treatment Sex Discrimination and Hostile Work Environment

### 1. Standard of Review

{¶ 47} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). We accord no deference to the trial court's decision and conduct an independent review of the record to determine whether summary judgment is appropriate.

{¶ 48} Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law. *Id.* On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292–293

(1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

{¶ 49} A fact is material if it "'might affect the outcome of the suit under the governing law' of the case." *Oko v. Cleveland Div. of Police*, 2021-Ohio-2931, ¶ 23 (8th Dist.), quoting *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993). "A factual dispute is 'genuine' only if 'it allows reasonable minds to return a verdict for the nonmoving party.'" *Huntington Natl. Bank v. Blount*, 2013-Ohio-3128, ¶ 32 (8th Dist.), quoting *Sysco Food Servs. v. Titan Devs.*, 1995 Ohio App. LEXIS 4762, *7 (9th Dist. Oct. 25, 1995).

{¶ 50} In her complaint, Montgomery asserted five claims against appellees: (1) sex discrimination-hostile work environment, (2) sex discrimination-disparate treatment, (3) constructive discharge, (4) violation of public policy and (5) intentional infliction of emotional distress. In her appellate brief, Montgomery's focus is on her constructive discharge claim. She asserts that "this is a constructive discharge case" and that "the cumulative harassment, hostile work environment, and disparate treatment she endured" "compelled her to resign."

{¶ 51} In her second assignment of error, Montgomery argues that her burden on summary judgment was "to come forward with sufficient evidence to demonstrate that reasonable minds could differ as to whether the cumulative effect

of the sexual harassment, hostile work environment, and disparate treatment was so intolerable that she felt compelled her to resign" and that she "clearly met that burden."[9] However, Montgomery does not show or explain how she allegedly met that burden. She simply asserts — directing this court, in a footnote, to "the evidence" on "page 18 of her BIO filed in the trial court"[10] — that the trial court "was required to look at the cumulative facts and circumstances" of her "entire employment" with ExchangeBase and "failed to do so." She, therefore, requests that we reverse the trial court's decision on summary judgment and remand the case "for a trial by [her] peers."

{¶ 52} Pursuant to R.C. 4112.02(A), it is an "unlawful discriminatory practice . . . [f]or any employer, because of the . . . sex . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any

---

[9] Montgomery does not even mention her claims for violation of public policy or intentional infliction of emotional distress in her appellate brief — let alone argue that the trial court erred in granting summary judgment in favor of appellees on those claims. Accordingly, we do not address those claims here. App.R. 16(A)(7); App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).").

[10] As stated above, an appellant does not comply with App.R. 16(A)(7) by directing this court to, and incorporating by reference, arguments from other sources. *See, e.g., Barry*, 2023-Ohio-1570, at ¶ 11; *Curtin*, 2008-Ohio-2040, at ¶ 9. Further, page 18 of Montgomery's brief in opposition does not contain any such evidence. It consists of a reference to "foregoing [deposition] testimony" that was "elected by Defendants' counsel on cross-examination," a brief criticism of the "self-serving" affidavits and salary spreadsheet appellees submitted in support of their motion for summary judgment, a reference to documents allegedly supporting her view of the case that Montgomery claims were requested in discovery but not produced by appellees and a recitation of the standard for summary judgment under Civ.R. 56(C).

matter directly or indirectly related to employment." R.C. 4112.02(A)'s prohibition of sexual discrimination in employment includes "'hostile environment' harassment," i.e., "harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment." *Hampel v. Food Ingredients Specialties*, 89 Ohio St.3d 169, 176 (2000).

### 2. Constructive Discharge

{¶ 53} Constructive discharge exists where an employer's actions make working conditions so intolerable that a reasonable person, under the circumstances, would have felt compelled to resign. *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 588-589 (1996). "A claim of constructive discharge is in essence a claim that the employer's conduct was so egregious that the employee was forced to sever the employment relationship involuntarily." *Vogt v. Total Renal Care, Inc.*, 2016-Ohio-4955, ¶ 24 (8th Dist.), citing *Bowers v. Hamilton City School Dist. Bd. of Edn.*, 2002 Ohio App. LEXIS 1356, *16 (12th Dist. Mar. 25, 2001). Ohio courts apply an objective test in determining whether an employee was constructively discharged, considering "whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent." *Mauzy* at 588-589; *Vogt* at ¶ 25.

{¶ 54} To prevail on a constructive discharge claim premised on disparate treatment sexual discrimination, a plaintiff must establish that she was subject to disparate treatment based on her sex and show that a reasonable employer would have foreseen that she would resign, given the sexual discrimination she faced.

Similarly, to prevail on a claim of constructive discharge premised on a hostile working environment based on sexual harassment, a plaintiff must establish the existence of a hostile working environment based on sexual harassment and show that a reasonable employer would have foreseen that she would resign, given the sexual harassment she faced. *See, e.g., Fox v. Lorain Cty.*, 2007-Ohio-6143, ¶ 27 (9th Dist.).

### 3. Disparate Treatment Sex Discrimination

{¶ 55} A plaintiff may prove disparate treatment sex discrimination by direct evidence or indirect evidence. Direct evidence is "'evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Birch v. Cuyahoga Cty. Probate Court*, 2007-Ohio-6189, ¶ 23 (8th Dist.), quoting *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999); *Jones v. Unican Ohio, LLC*, 2022-Ohio-948, ¶ 31 (8th Dist.). In considering whether statements constitute direct evidence of discrimination, courts consider: (1) whether the comments were made by a decision-maker; (2) whether the comments were related to the decision-making process; (3) whether they were more than vague, isolated or ambiguous remarks; and (4) whether they were proximate in time to the adverse, alleged discriminatory action. *Birch* at ¶ 23; *Jones* at ¶ 33. "Because employers typically do not announce their discriminatory intent, direct evidence of discrimination is rare." *Kelley v. Dayton Pub. School Bd. of Edn.*, 2024-Ohio-979, ¶ 26 (2d Dist.).

**{¶ 56}** Sex discrimination claims based on indirect evidence are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[11] To establish a prima facie case of sex discrimination using indirect evidence, a plaintiff must demonstrate that (1) he or she is a member of a protected class, (2) he or she was qualified for the position in question, (3) he or she suffered an adverse employment action despite her qualifications and (4) he or she was treated less favorably than a similarly situated individual outside the protected class. *Birch* at ¶ 21; *Smith v. ExpressJet Airlines, Inc.*, 2015-Ohio-313, ¶ 13 (8th Dist.). If the plaintiff establishes a prima facie case of sex discrimination, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. *Birch* at ¶ 21, citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Smith* at ¶ 13. If the employer carries its burden, the burden shifts back to the plaintiff to establish that the employer's proffered reason was not the true reason but a pretext for discrimination. *Birch* at ¶ 21; *Smith* at ¶ 13. At all times, however, "'[t]he ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the plaintiff remains with the plaintiff.'" *Birch* at ¶ 21, quoting *Burdine* at 253.

---

[11] Due to the similarities between R.C. 4112.02 and Title VII of the Civil Rights Act of 1964 ("Title VII"), Ohio courts often look to federal cases interpreting Title VII when considering employment discrimination claims brought under Ohio law. *See, e.g., Ingram v. Glavin*, 2023-Ohio-1290, ¶ 46 (8th Dist.); *see also Wholf v. Tremco Inc.*, 2015-Ohio-171, ¶ 24 (8th Dist.) (observing that because Ohio's antidiscrimination laws in R.C. Chapter 4112 are "modeled after Title VII," Ohio courts have found federal case law interpreting Title VII to be generally applicable to cases involving alleged violations of R.C. Chapter 4112).

## 4. Hostile Work Environment

{¶ 57} A hostile work environment exists where a workplace "'is permeated with discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), quoting *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986) (internal quotation omitted).

{¶ 58} To prevail on a hostile work environment claim based on sexual harassment, a plaintiff must show that (1) he or she was subject to unwelcome harassment, (2) the harassment was based on sex, (3) the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment" and (4) either (a) the harassment was committed by a supervisor or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Hampel*, 89 Ohio St.3d at 176-177.

{¶ 59} The standard for assessing hostility is "demanding" in order to "filter out complaints that attack 'the ordinary tribulations of the workplace.'" *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998), quoting B. Lindemann & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992); *see also Chapa v. Genpak, LLC*, 2014-Ohio-897, ¶ 35 (10th Dist.) (same); *Parker v. Hankook Tire Mfg. Tenn., LP*, 2023 U.S. App. LEXIS 34010, *10 (6th Cir. Dec. 21, 2023) ("'This standard sets a high bar

for plaintiffs in order to distinguish meaningful instances of discrimination from instances of simple disrespect.'"), quoting *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 485 (6th Cir. 2020).  Conduct that is "merely offensive" is insufficient to support a hostile work environment claim.  *Harris* at 21.  Likewise, actions such as "simple teasing, offhand comments, and off-color jokes, while often regrettable, do not cross the line into actionable misconduct."  *E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010).

{¶ 60} In evaluating whether alleged harassment was sufficiently "severe or pervasive" to affect the terms, conditions or privileges of employment and create a hostile work environment, the work environment must be viewed "as a whole," considering the "totality" of the facts and circumstances, including the frequency of the alleged discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance.  *Hampel* at 180-181.  "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether — taken together — the reported incidents make out such a case."  *Williams v. GMC*, 187 F.3d 553, 562 (6th Cir. 1999); *Clay v. UPS*, 501 F.3d 695, 708 (6th Cir. 2007) (observing that in a hostile work environment, the actionable wrong is the environment, not the individual acts that together create the environment).

{¶ 61} The "severe or pervasive" inquiry has both an objective and a subjective component:  "'The conduct must be severe or pervasive enough to create

an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive.'" *Johnson v. Ford Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021), quoting *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997); *see also Hampel*, 89 Ohio St.3d at 176 ("'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.'"), quoting *Harris*, 510 U.S. at 21-22; *Rice v. Cuyahoga Cty. DOJ*, 2005-Ohio-5337, ¶ 32 (8th Dist.); *Chapa*, 2014-Ohio-897, at ¶ 55.

{¶ 62} Although it has been said that the question of whether conduct is severe or pervasive is "'quintessentially a question of fact,'" *see, e.g., Retuerto v. Berea Moving Storage & Logistics*, 2015-Ohio-2404, ¶ 40 (8th Dist.), quoting *Stachura v. Toledo*, 2008-Ohio-3581, ¶ 33 (6th Dist.), courts have, nevertheless, affirmed grants of summary judgment, in appropriate cases, after determining that the alleged conduct was not sufficiently severe or pervasive to create a hostile work environment as a matter of law. *See, e.g., State v. Hinton*, 2022-Ohio-4783, ¶ 41 (8th Dist.) (summary judgment was appropriate on hostile work environment claim where appellants failed to demonstrate a genuine issue of fact that alleged racial harassment was so severe or pervasive as to create an objectively hostile work environment); *Chapa*, 2014-Ohio-897, at ¶ 65-66, 68-69 (trial court properly

granted summary judgment in favor of employer on hostile work environment claim where reasonable minds could come but one conclusion on the issue).

{¶ 63} Further, a hostile work environment constructive discharge claim requires proof of more than the severe or pervasive conduct required for a hostile work environment claim. "'While a hostile-work-environment claim requires a plaintiff to prove "severe or pervasive" harassment, . . . [a] plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign.'" *Godsey-Marshall v. Phillipsburg*, 2010-Ohio-2266, ¶ 23 (2d Dist.) (describing such a "compound claim" as "'an aggravated case of, sexual harassment or hostile work environment'"), quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146 (2004); *see also Greenberg v. Toledo Pub. Schools*, 2023-Ohio-864, ¶ 41 (6th Dist.); *Mowery v. Columbus*, 2006-Ohio-1153, ¶ 27-28 (10th Dist.).

## C. Montgomery's Failure to Meet her Burden on Appeal

{¶ 64} As the appellant, it is Montgomery's burden to affirmatively demonstrate reversible error in the record and to substantiate her arguments in support thereof. *See, e.g., Mitchell v. Dir. Ohio Dept. of Job & Family Servs.*, 2024-Ohio-2073, ¶ 28-29 (8th Dist.); *Eagle's View Professional Park Condominium Unit Owners Assn., Inc. v. EVPP, L.L.C.*, 2015-Ohio-1929, ¶ 21 (12th Dist.); *see also Toliver v. Vectren Energy Delivery of Ohio, Inc.*, 2015-Ohio-5055, ¶ 30 (appellant's arguments, undeveloped "beyond conclusory statements" and "[u]nsupported legal conclusions," did not demonstrate error; "disagreement" with orders below is

"insufficient to establish reversible error"). It is not the duty of this court to "root out" or develop an argument that could support an assigned error — even if one exists — or to search the record for evidence to support an appellant's position. *See, e.g., Vari v. Coppola*, 2019-Ohio-3475, ¶ 10 (7th Dist.); *see also La Spisa v. La Spisa*, 2023-Ohio-3467, ¶ 57 (8th Dist.) ("It is not this court's role to scour the record to root out issues and arguments."); *UBS Fin. Servs. v. Lacava,* 2018-Ohio-3276, ¶ 21 (8th Dist.) (It is not the function of an appellate court "to construct a foundation" for an appellant's claims.) (citations omitted).

{¶ 65} Montgomery has not met her burden here. She has not shown that the trial court erred in granting summary judgment in favor of appellees on her claims. In support of her second assignment of error, Montgomery merely quotes authority regarding what is required to prove constructive discharge. Here, as in her in brief in opposition to summary judgment below, Montgomery does not even identify the elements of a claim for disparate treatment sex discrimination or a hostile work environment claim much less apply the applicable legal standards and show that, based on evidence in the record, a reasonable factfinder could find in favor of Montgomery as to those claims or her constructive discharge claim.

{¶ 66} While appellees met their burden under Civ.R. 56(C), presenting evidence of specific facts in the record demonstrating their entitlement to summary judgment based on the lack of evidence of essential elements of each of Montgomery's claims, it cannot be said that Montgomery met her reciprocal burden, i.e., pointing to evidence of specific facts in the record demonstrating the existence

of a genuine issue of material fact for trial on her sex discrimination, hostile work environment and constructive discharge claims. To the contrary, Montgomery has not even attempted to show that the evidence she presented demonstrated the existence of a genuine issue of material fact for trial as to any of her claims. Montgomery, likewise, has not cited any cases involving similar facts in which a sexual discrimination claim, hostile work environment claim or constructive discharge claim survived summary judgment.

{¶ 67} Even if we were to do what Montgomery has not and apply the applicable legal standards to the facts and evidence in this case, it would not change the result. Following a careful, thorough review, we find that the record does not contain any genuine issues of material fact that would preclude summary judgment in favor of appellees.

{¶ 68} Montgomery has presented no evidence that any alleged disparity in compensation among similarly situated employees was based on sex. The salary spreadsheet attached to Donahue's affidavit shows that salaries varied widely and changed frequently. It does not establish that Montgomery, or women generally, were being paid less than similarly situated men. Montgomery has not presented any evidence contradicting the information in the spreadsheet.

{¶ 69} Montgomery has likewise presented no evidence from which it could be reasonably inferred that the assignment of projects following Matthews' departure was based on sex, that the "secret" hiring of Stetzer for the director of business development position was based on sex or that Montgomery was denied

any other employment opportunities or suffered any other adverse employment action because of her sex.

{¶ 70} Although certain of the acts and comments Montgomery found objectionable may have been insensitive or obnoxious, R.C. Chapter 4112, like Title VII, is not meant to be a general, workplace "civility code" and the "'sporadic use'" of profanity, "'abusive language, . . . jokes, and occasional teasing'" is not sufficient to establish liability on a hostile work environment claim. *Faragher,* 524 U.S. at 788, quoting *Sexual Harassment in Employment Law* at 175; *Fox,* 2007-Ohio-6143, at ¶ 29.[12]

{¶ 71} The evidence Montgomery presented does not paint a picture of a workplace "permeated with discriminatory intimidation, ridicule, and insult" because of her sex. Bok's reference to a night at a strip club, Sheridan's one-time request that Montgomery use "her southern charm" to "sweet talk" a customer, Montgomery's discussion with Sheridan regarding the availability of maternity leave (prior to any known pregnancy or request for maternity leave), Sheridan's statement to Cool that they would "show these women how the work here is done," Kowalski's one-time, offhand comment regarding Montgomery's weight loss and his use of profanity to express his anger or frustration with Montgomery on two occasions (to

---

[12] Although Montgomery testified that she perceived Kowalski's use of the phrase "go f*** herself" as being a "sexual reference," we note that the phrase is generally considered an to be an idiom — a rude, slang, forceful expression of anger, dismissal or contempt directed at another — that means something different than its literal meaning. *See, e.g.,* https://idioms.thefreedictionary.com/go+fuck+yourself (last accessed June 4, 2024).

one of which Montgomery responded in kind) over one-and-one-half years of employment was not sufficiently severe or pervasive that a reasonable person could find Montgomery's work environment to be objectively hostile due to sexual or gender-based harassment. These comments were isolated and were not related to any decision-making process. Given that Montgomery could not prove her allegations of disparate treatment sex discrimination or a hostile work environment based on sexual or gender-based harassment, she could not prove her claim that she was constructively discharged based on such discrimination or harassment. *See, e.g., Godsey-Marshall*, 2010-Ohio-2266, at ¶ 23; *see also White v. Bay Mech. & Elec. Corp.*, 2007-Ohio-1752, ¶ 15-16 (9th Dist.) ("[W]hen a hostile environment claim and a constructive discharge claim are brought together, a party cannot succeed on the constructive discharge claim if he has failed in his attempt to prove the hostile environment claim. . . . '[T]he working conditions undergirding a claim of constructive discharge must be even more egregious than those that would support a hostile work environment claim. . . . [T]he conditions must be intolerable because of the unlawful discrimination.'"), quoting *Rait v. Oshkosh Architectural Door Co.*, 2007 U.S. Dist. LEXIS 15076, *25-26 (E.D. Wis. Mar. 1, 2007). Based on the facts presented, the working conditions to which Montgomery was subjected were not intolerable that a reasonable person would have felt compelled to resign.

{¶ 72} We overrule Montgomery's assignments of error.

{¶ 73} Judgment affirmed.

It is ordered that appellees recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
LISA B. FORBES, J., CONCUR