[Cite as *Hopkins v. Greater Cleveland Regional Transit Auth.*, 2026-Ohio-936.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

DAVID HOPKINS,                            :

    Plaintiff-Appellant,          :

                                 No. 115301

    v.                             :

GREATER CLEVELAND REGIONAL
TRANSIT AUTHORITY,                        :

    Defendant-Appellee.           :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** March 19, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-972339

*Appearances:*

Paul Knott, *for appellant*.

Janet E. Burney, General Counsel-Deputy Manager for
Legal Affairs, and Brian R. Gutkoski, Associate Counsel II,
*for appellee*.

DEENA R. CALABRESE, J.:

{¶ 1} Plaintiff-appellant David Hopkins ("Hopkins" or "appellant") appeals

the trial court's grant of summary judgment in favor of defendant-appellee Greater

Cleveland Regional Transit Authority ("GCRTA" or "appellee") on a negligence claim

relating to his fall in a GCRTA bus.  After a thorough review of the law and facts, we reverse the decision of the trial court and remand for further proceedings.

## I. Procedural History and Summary of Facts

### A. Procedural History

{¶ 2} Appellant filed his initial complaint on January 13, 2021.  He voluntarily dismissed that case on December 17, 2021, and refiled it on December 8, 2022.  Appellant contends that he fell on a GCRTA bus because of the driver's negligence, sustaining an injury that required surgery, several months off work, and caused continuing discomfort.  More specifically as to the species of negligence alleged, appellant's complaint states:

> [GCRTA] was negligent in operating the bus at an excessive rate of speed and failing to safely bring the bus to a stop when they knew or should have known that [appellant] was attempting to exit the bus and that the aisle was wet and slippery.

(Complaint at ¶ 5.)

{¶ 3} Trial had been set for August 16, 2023.  In advance of trial, appellant filed the deposition transcripts of two expert witnesses, forensic professional engineer Jessica Ellis, P.E., and appellant's treating orthopedic surgeon, Irwin Mandel, M.D.

{¶ 4} Further procedural history is detailed, to some extent, in *Hopkins v. Greater Cleveland Regional Transit Auth.*, 2024-Ohio-2265 (8th Dist.) ("*Hopkins I*"), a decision on GCRTA's interlocutory appeal.  Prior to trial, GCRTA had requested and received a dispositive-motion deadline, explicitly noting that it intended to argue political-subdivision immunity.  *Id*. at ¶ 2.  The trial court set a

deadline of June 16, 2023, for dispositive motions, and as noted, trial was set for August 16, 2023. *Id.* at ¶ 3. GCRTA later filed a motion for an extension of time seeking a new dispositive-motion deadline of July 21, 2023. *Id.* Based on a docket entry ultimately determined to be the court clerk's notation rather than a controlling journal entry, *id.* at ¶ 18-20, GCRTA purportedly believed the motion for extension had been granted. Thereafter, GCRTA filed a motion for summary judgment after the original deadline but prior to what it incorrectly believed was the new deadline. *Id.* at ¶ 2-7 and 12.

{¶ 5} In an August 10, 2023 journal entry addressing GCRTA's motions, "[t]he trial court's entry did not explicitly deny the motion for enlargement of time to file dispositive motions, nor did it rule on the actual motion for summary judgment." *Id.* at ¶ 7. Instead, it "found that GCRTA's motion for summary judgment was not before the court." *Id.* The trial court reasoned that GCRTA had not filed its motion for summary judgment within the original deadline, that the motion for summary judgment was therefore filed without leave, and that there "was insufficient time" under Civ.R. 6(C) for the plaintiff to respond to any summary-judgment motion prior to the agreed-upon trial date of August 16, 2023. *Id.*

{¶ 6} GCRTA filed a notice of appeal prior to trial. This court ultimately held that the trial court effectively denied GCRTA's motion for an enlargement of time to file its summary-judgment motion, that GCRTA was thereby denied the benefit of its alleged immunity defense, and that the August 10, 2023 judgment entry was therefore a final appealable order. *Id.* at ¶ 12 and 21. This court nevertheless held

"that the trial court's effective denial of GCRTA's June 15, 2023 motion for enlargement of time [to file its motion for summary judgment] was not so palpably and grossly violative of fact or logic that the trial court's attitude was unreasonable, arbitrary, or unconscionable." *Id.* at ¶ 28. The trial court noted that GCRTA had failed to timely file its motion for summary judgment despite indicating that little or no additional discovery would be required in the refiled action and that it failed to seek a trial continuance. *Id.* at ¶ 22-24. The *Hopkins I* Court also noted that the plaintiff's summary-judgment-opposition deadline would be later than the trial date and the trial court did not abuse its discretion in denying GCRTA's motion to shorten the plaintiff's response time. In its blended analysis of these overlapping issues, this court wrote that "the trial court considered Hopkins's due process right of a fair opportunity to respond to GCRTA's motion for summary judgment when it denied GCRTA's motion for an enlargement of time to file its motion." *Id.* at ¶ 27.

{¶ 7} This court cited *Supportive Solutions, L.L.C. v. Electronic Classroom of Tomorrow*, 2013-Ohio-2410, for the proposition "that a trial court abuses its discretion when it denies a motion for leave without justification, where the affirmative defense was tendered timely, in good faith, and the opposing party would not be prejudiced." *Hopkins I* at ¶ 27. As discussed above, GCRTA had represented to the court that little to no additional discovery would be required to support its political-subdivision-immunity motion, it "never filed a motion for leave to plead its untimely motion for summary judgment," and it had not moved for a trial continuance, instead opting to request that the trial court shorten the plaintiff's

summary-judgment-response time to keep the agreed-upon trial date. *Id*. at ¶ 27. The *Hopkins I* Court noted the trial court's consideration of the plaintiff's due-process right to respond. *Id*. This court therefore affirmed the trial court's decision. *Id*. at ¶ 28-29.

{¶ 8} This court denied GCRTA's motion for reconsideration of *Hopkins I*, after which GCRTA appealed to the Ohio Supreme Court. The Ohio Supreme Court declined to accept jurisdiction by order dated November 26, 2024. The same day, before the case was returned to the trial court's active docket, GCRTA filed another motion for leave to file a motion for summary judgment. Appellant opposed the motion. The case was returned to the trial court's active docket on December 13, 2024. The same day, before the trial court issued any ruling on GCRTA's motion for leave, GCRTA filed its motion for summary judgment.

{¶ 9} By order dated January 11, 2025, the trial court granted GCRTA's motion for leave and deemed its motion for summary judgment filed as of that date. Summary judgment briefing continued thereafter. As detailed below, GCRTA moved to strike certain evidence that appellant submitted in opposition to summary judgment. The trial court, however, never ruled on GCRTA's motion to strike.

{¶ 10} On July 2, 2025, the trial court docketed an opinion and judgment entry granting GCRTA's motion for summary judgment and dismissing appellant's claims with prejudice.

**B. Summary of Facts**

**1. Appellant's Fall and Medical Treatment**

{¶ 11} On January 15, 2019, appellant fell on a GCRTA bus while traveling home from his work at the Cleveland House of Blues. He had finished his shift early in the afternoon, at 12:52 p.m. He walked to Terminal Tower and took a GCRTA train to the West Park GCRTA station without incident, after which he transferred to GCRTA's #75 bus line. Appellant boarded the bus, took a seat, and remained seated until the bus approached his stop. By the time the bus approached the Barton Road stop on Lorain Road, he was the only passenger. He signaled for the stop.

{¶ 12} The entire sequence leading to appellant's fall was captured from several angles by GCRTA's video system, which captures multiple interior and exterior views. As appellant stood from his seat, he grabbed the adjacent handrail, appearing to hold on to it while he readied for his exit. He then began walking forward, grabbing another handrail with his left hand. The video footage appears to indicate that as he proceeded forward, he released that handrail and grabbed another handrail with his left hand. His feet nevertheless slid out from under him, and he fell to the bus floor.

{¶ 13} Appellant's treating orthopedic surgeon, Irwin M. Mandel, M.D., testified that it was his "opinion with a reasonable degree of medical certainty that [appellant] injured his right lower extremity when he fell on January 17th [sic], 2019," more specifically, that appellant "sustained a quadriceps tendon tear as a

direct and proximate result of the fall and the injury." (Mandel dep. at 26.)[1]  He performed surgery on appellant on January 23, 2019, just a few days after appellant's fall, to repair the torn tendon.  (Mandel dep. at 14-17 and 27.)  Dr. Mandel further testified that his treatment of appellant, including surgery, was reasonable, necessary, and proximately related to the injuries appellant sustained from his fall on the GCRTA bus.  (Mandel dep. at 26-27.)

## C. Testimony and Other Evidence With Respect to Negligence

{¶ 14} During his deposition, appellant readily admitted that he observed that the bus floor was wet:

> Q.     Okay.  Did you look in the aisleway at all when you were sitting down to see that there might have been some moisture on the floor?
>
> A.     Yes.
>
> Q.     All right.  So you saw that, and you were aware of it?
>
> A.     Oh, yeah.

(Appellant dep. at 22.)

{¶ 15} Appellant denied, however, that moisture on the floor was the sole reason for his fall.  Appellant testified at his deposition that the speed limit on Lorain Road near the Barton Road stop was 35 m.p.h.  Prior to securing an expert witness to offer an opinion regarding the speed the bus was traveling, appellant testified at deposition that the bus was exceeding the speed limit.  More importantly, when

---

[1] Dr. Mandel noted elsewhere in his deposition that January 17, 2019, was appellant's first visit for evaluation and that "the initial injury happened January 15th, 2019." (Mandel dep. at 8.)

GCRTA asked him to agree that the reason he fell was the moisture on the floor, appellant testified:

> No. The reason I slipped and fell was because the driver was going at a high rate of speed, probably faster than she should have been considering that I had signaled for a stop.

(Appellant dep. at 24.) Appellant further testified that he had never previously slipped while a bus was coming to a stop. (Appellant dep. at 24.)

{¶ 16} Review of appellant's deposition reflects that GCRTA's examination focused on whether the wet floor was readily observable to appellant (i.e., setting up an open-and-obvious defense). GCRTA did not meaningfully follow up on appellant's statement that the bus was traveling "at a high rate of speed" or ask him questions about the manner in which the bus came to a stop. Instead, GCRTA suggested appellant could have remained seated until the bus stopped. (Appellant dep. at 24.)

{¶ 17} Moreover, despite appellant's sworn testimony that he had never previously slipped while the bus was coming to a stop and the averment in the complaint that both "excessive rate of speed and failing to safely bring the bus to a stop" contributed to his fall, GCRTA did not ask appellant whether the bus came to a sudden stop in this instance, whether anything was unusual about the way the bus stopped, or anything else about the stop itself. Instead, GCRTA returned to the topic of water on the floor. Rather than ask whether the mechanics of the stop were out of the ordinary, it inquired:

> Q. Okay. Was this particular trip any different in light of the fact that there was water on the floor?

A. No.

(Emphasis added.) (Appellant dep. at 24.)

{¶ 18} Appellant's opposition to GCRTA's motion for summary judgment was accompanied by appellant's affidavit. In his affidavit, appellant noted his observation that the floors were wet and slippery and stated he was making his way to the front while "grabbing the handrails" with the goal of "safely negotiating the wet and slippery floor and the high rate of speed at which the bus was traveling." (Appellant aff. at ¶ 9.) His affidavit then states:

> 10. As the bus neared the Barton Road stop, the driver suddenly and forcefully applied the brakes, bringing the speeding bus to an unusually sudden, forceful and violent stop.
>
> 11. As a result of the driver bringing the speeding bus to a sudden, forceful and violent stop, I was caused to fall and suffer injury to my right quadricep tendon.
>
> . . .
>
> 15. I have been riding the GCRTA on a daily basis since 2004. In all my years of riding GCRTA, I had never before fallen and never before experienced such a sudden, forceful and violent stop as on January 15, 2019.

(Appellant aff. at ¶ 10-11 and 15.)

{¶ 19} Appellant deposed GCRTA's information technology director, Michael Lively, with respect to GPS or other tracking systems employed by GCRTA to track the speed and location of buses, including information pertinent to the bus on which appellant was riding on January 15, 2019. (Lively dep. at 7 and 11.) Lively testified that based on GCRTA data, the bus appeared to be running approximately six minutes behind schedule. (Lively dep. at 32.)

{¶ 20} Appellant's testimony that the speed limit was 35 m.p.h. on the relevant section of Lorain Road was corroborated by the testimony of forensic engineer Ellis. (Ellis dep. at 16.) Ellis, like appellant, also opined that the bus driver was speeding. She testified that she holds a bachelor's degree in mechanical engineering and a master's degree in optical engineering. (Ellis dep. at 5-6.) Ellis testified she was a licensed professional engineer in both Indiana and Kentucky. (Ellis dep. at 9.) She holds a patent "for a combined park and turn lamp." (Ellis dep. at 9.) Ellis testified that in her role as a forensic engineer, she applied "scientific and mathematical principles in the investigation and analysis of events such as vehicular collisions as well as products and failures" and "accident reconstruction." (Ellis dep. at 6 and 8.) She received additional training regarding crash investigation at Northwestern University. (Ellis dep. at 9.) On cross-examination, she testified that she had served as an expert in Ohio court cases approximately ten times. (Ellis dep. at 28-29.)

{¶ 21} Appellant had tasked Ellis with determining "the speed, the dynamics of the bus leading up to [appellant's] fall," i.e., "the speed as well as deceleration of the bus specifically." (Ellis dep. at 10.) She testified that "[t]he mechanics of motion are fundamental to the engineering discipline and those are the equations that I applied to determine the speed and deceleration of the bus prior to [appellant's] fall." (Ellis dep. at 10.) In working up her analysis, she used the video footage from the bus, timestamped GPS locations, and Google Earth location information. Ellis testified:

So speed is essentially the distance traveled within a certain time frame. So to determine the speed of the bus, what I did was I reviewed the video footage, and using Google Earth I was able to position the bus at certain points along the roadway and with those positions I also had a time and so I was able to determine the distance over which the bus traveled on the route and the time in which it took the bus to travel that distance and from that I was able to determine the speed of the bus prior to [appellant's] fall.

And then in order to determine deceleration, I was able to see from the video footage the brake, the rear brake lights on the bus, I was able to see the red light emitted from that to determine when the brakes on the bus were applied prior to [appellant's] fall. And using that time frame and the speed I determined of the bus, I could then determine an average deceleration of the bus over that eight seconds of braking.

(Ellis dep. at 12.)

{¶ 22} Ellis testified that in reviewing the video footage, she determined that the driver applied the brakes approximately one second after appellant left his seat. (Ellis dep. at 15.) She explained the limitations of her analysis, e.g., that she could determine only average speed and deceleration, and not fluctuations. (Ellis dep. at 18-19.) Ellis then testified that to a reasonable degree of engineering certainty, "[o]n average, the speed of the bus prior to Mr. Hopkins' fall was between 40.1 to 41.6 miles per hour." (Ellis dep. at 20.) She testified that this average speed was "actually an underestimation" because of the limitations on concrete data i.e.:

So actually I determined the distance to the stop bar at the intersection of Barton Road and that did not account for, there's approximately 150 to 200 feet of braking prior to that and so my estimation is actually an underestimation of the speed of the bus prior to impact so it is likely, it's likely a little bit higher than what I evaluated because I am not accounting for that additional braking time . . . of the bus.

(Ellis dep. at 20-21.) She ultimately testified that her opinion, to a reasonable degree of engineering certainty, was that "the average speed of the bus prior to Mr. Hopkins'

fall within that 3,000 feet prior, that it is exceeding the posted speed limit of 35 miles per hour." (Ellis dep. at 22.)

{¶ 23} GCRTA employee Oliver Draper identified himself at deposition as the director of GCRTA's Triskett bus garage. The record indicates that GCRTA produced him in response to a Civ.R. 30(B)(5) request for an authorized representative familiar with safety issues, specifically an individual "familiar with precautions employed to make sure that the buses are operating within the posted speed limits and safely brought to a stop so that passengers who are in the aisles while the bus is moving are not injured," as well as the education and training of drivers. (Draper dep. at 8.)

{¶ 24} Asked whether it was "ever acceptable for a bus operator to operate the bus in excess of the . . . posted speed limit[,]" Draper responded, "No. Our drivers are taught to follow the laws and follow speed limits." (Draper dep. at 34.) He further testified that in addition to following the speed limit, a driver should both "start smoothly" and "stop smoothly." (Draper dep. at 34.) GCRTA also "ask[s] drivers to be extra cautious in inclement weather" not only because the roads can be challenging but because the "[f]loors can get wet" and "slippery." (Draper dep. at 49.)

{¶ 25} In conjunction with his opposition brief and affidavit, appellant also filed a copy of GCRTA's bus operator handbook, which was electronically Bates numbered and produced by GCRTA in response to discovery requests. Section 304.1 of the handbook specifies that "[o]perators shall not exceed the posted speed limits

at any time." The handbook also specifies that when individuals are standing or walking in the bus without holding on to seats or railings, drivers should "[s]tart gradually, stop smoothly, and make smooth turns" as "Defensive Action." (Operator handbook at p. 29.) Section 501.6 of the handbook further instructs drivers as follows: "When moving or stopping the coach do so as smoothly as possible to avoid customer falls."

{¶ 26} GCRTA promptly moved to strike appellant's affidavit, its own handbook, and the expert testimony of Ellis. Its arguments are largely repeated on appeal. Briefly put, GCRTA argued that appellant's affidavit was a sham and contradicted his deposition testimony. It further argued that its own handbook, which it produced in discovery, was not authenticated. Finally, it argued that Ellis's expert testimony was improper and should not be considered.

{¶ 27} Appellant filed a brief in opposition to the motion to strike. The same day, in an effort to secure the trial court's consideration of GCRTA's bus operator handbook, appellant moved for leave to supplement his opposition to summary judgment instanter with GCRTA's responses to his first set of interrogatories and request for production of documents. The responses indicated that appellant had requested, inter alia, "copies of any manuals, guidelines, or other written materials" provided to drivers "regarding safety policies as to the operation of GCRTA bus" in effect during the relevant time period. (Request for production no. 3.) GCRTA generally objected but then referenced "documents being produced[,]" which it identified as "GCRTA 001-117." (The handbook bears Bates numbers 001-098.) The

responses also include a notarized verification page indicating that GCRTA's affiant, having been "first duly sworn, depose[s] and state[s] that [she has] carefully reviewed and answered the foregoing Interrogatories *and Request for Production of Documents* and the answers are true to the best of my knowledge." (Emphasis added.)

{¶ 28} GCRTA filed a reply brief in support of its motion to strike. The trial court never ruled on GCRTA's motion to strike, and its final order does not mention the motion.

{¶ 29} On July 2, 2025, the trial court granted GCRTA's motion for summary judgment. The trial court first analyzed the case as one involving a hazard that is open an obvious, which it noted "obviates any duty to warn." It noted that appellant had conceded he observed the hazard but that a common carrier such as GCRTA "may still be liable for negligently failing to abate the hazard, no matter how open and obvious, if such action is 'consistent with the practical operation of the system.'" The trial court rejected the notion of requiring bus drivers to be "swabbing the floors every time water slush, snow" or another naturally occurring slippery substance makes it way onto a bus.

{¶ 30} The trial court next found that "the record is devoid of evidence of negligence by the driver in her operation of the bus, despite [appellant's] testimony that the driver was going too fast." It wrote:

> Such a contention would require not only some more concrete assertion of what the "high rate of speed" actually was, but also testimony by an expert — or at least an experienced bus driver — on

whether, or when, a bus driver fails to meet the standard of care by continuing to drive the bus as a passenger is standing or walking. And here, again, stopping or slowing the bus every time a passenger stands up is simply incompatible with the practical operation of a bus line.

{¶ 31} Having granted GCRTA's motion to for summary judgment, the trial court dismissed appellant's claims with prejudice. This timely appeal followed.

## II. Assignment of Error

{¶ 32} Appellant presents a single assignment of error for our review:

Construing the record and all inferences in Mr. Hopkins' favor, genuine issues of material fact exist upon which a reasonable jury could find that the Greater Cleveland Regional Transit Authority's (hereinafter "GCRTA") bus driver breached the highest duty of care owed to Mr. Hopkins and proximately caused his injury.

{¶ 33} We conclude that there are genuine issues of material fact as to whether the bus on which appellant was riding came to an unusually sudden, forceful, or violent stop, causing him to fall and sustain injuries. Accordingly, we reverse.

## III. Analysis

### A. Summary Judgment Standard of Review

{¶ 34} Civ.R. 56(C) provides in pertinent part:

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.*

{¶ 35} Ohio appellate courts "review summary judgment rulings de novo, applying the same standard as the trial court." *Montgomery v. ExchangeBase, LLC*, 2024-Ohio-2585, ¶ 47 (8th Dist.), citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). We therefore "accord no deference to the trial court's decision and conduct an independent review of the record to determine whether summary judgment is appropriate." *Montgomery* at ¶ 47. As this court explained in *Montgomery*:

> Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law. *Id.* On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

*Id.* at ¶ 48.

{¶ 36} "A fact is *material* if it 'might affect the outcome of the suit under the governing law' of the case." (Emphasis added.) *Oko v. Cleveland Div. of Police*, 2021-Ohio-2931, ¶ 23 (8th Dist.), quoting *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *See also Montgomery* at ¶ 49. In addition, "[o]nly *genuine* issues of material fact preclude summary judgment. A factual dispute is 'genuine' only if 'it allows reasonable minds

to return a verdict for the nonmoving party.'" (Emphasis in original.) *Huntington Natl. Bank v. Blount*, 2013-Ohio-3128, ¶ 32 (8th Dist.), quoting *Sysco Food Servs. v. Titan Dev.*, 1995 Ohio App. LEXIS 4762, *7 (9th Dist. Oct. 25, 1995), citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), and *Anderson. See also Montgomery* at ¶ 49.

**B. Immunity Generally**

{¶ 37} GCRTA is a political subdivision. *Mencini v. Greater Cleveland Regional Transit Auth.*, 2023-Ohio-2299, ¶ 15 (8th Dist.). "The functions of political subdivisions are either governmental or proprietary[,]" and pursuant to R.C. 2744.01(G)(2), "a proprietary function includes the 'establishment, maintenance, and operation of * * * a railroad, a busline or other transit company * * *.'" *Mencini* at ¶ 15, quoting R.C. 2744.01(G)(2).

{¶ 38} "In connection with either governmental or proprietary function, a political subdivision is generally not liable for any injury, death, or loss of property caused by an act or omission of the political subdivision or an employee of the political subdivision." *Mencini* at ¶ 15, citing R.C. 2744.02(A)(1). Political-subdivision immunity, however, is not absolute. "A political subdivision is liable if any of the five exceptions enumerated in R.C. 2744.02(B) applies." *Id.* at ¶ 16. Of the five exceptions, those set forth in division (B)(1) and (B)(2) are potentially applicable in this case. Under division (B)(1), a political subdivision is liable for "injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority." R.C. 2744.02(B)(1). Under division (B)(2),

"political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions." R.C. 2744.02(B)(2).

{¶ 39} Certain exceptions and defenses exist to the application of R.C. 2744.02(B)(1) and (B)(2). Here, however, GCRTA has not claimed that any of those exceptions or defenses apply. GCRTA has, however, argued that immunity was reinstated pursuant to R.C. 2744.03(A)(3) or (A)(5) as falling within "GCRTA's policymaking discretion." (GCRTA's brief at 8 and 34-35.) R.C. 2744.03(A)(3) provides for reinstatement of immunity where an employee's action or omission giving rise to a claim of liability "was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee." R.C. 2744.03(A)(5) restores immunity where the harm "resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."

## C. Restoration of Immunity

{¶ 40} We find no merit to GCRTA's argument that it can "policy" and "discretion" its way around a claim of driver negligence under either R.C. 2744.03(A)(3) or (A)(5). GCRTA has not cited any cases establishing it can leverage R.C. 2744.03(A)(3) or (A)(5) to restore immunity in a case alleging driver

negligence. This makes sense given the explicit exception to immunity created by R.C. 2744.02(B)(1), namely, the exception for an employee's negligent operation of a motor vehicle. GCRTA's proposed invocation of R.C. 2744.03(A)(3) or (A)(5) to restore immunity "creates an exception that would swallow the rule." *Roberts v. Nationwide Mut. Fire Ins. Co.*, 2011-Ohio-1101, ¶ 29 (8th Dist.). "To argue the legislature intended to absolve a political subdivision's employees from their negligent operation of a motor vehicle defies logic in light of the express language of R.C. 2744.02(B)(1); it possesses its own specific 'full defenses.'" *Id.*

{¶ 41} *Roberts* aside, the single case cited by GCRTA disposes of its arguments for restoration of immunity under both R.C. 2744.03(A)(3) and (A)(5). In *Frenz v. Springvale Golf Course & Ballroom*, 2012-Ohio-3568 (8th Dist.), this court addressed an R.C. 2744.03(A)(3) argument. It wrote that "'[i]mmunity operates to protect political subdivisions from liability based upon discretionary judgments concerning the allocation of scarce resources; it is not intended to protect conduct which requires very little discretion or independent judgment.'" *Id.* at ¶ 22, quoting *Hall v. Fort Frye Local School Dist. Bd. of Edn.*, 111 Ohio App.3d 690, 699 (4th Dist. 1996). *See also Toros v. Cuyahoga Cty. Bd. of Dev. Disabilities*, 2013-Ohio-4601, ¶ 33 (8th Dist.) (For purposes of R.C. 2744.03(A)(3), a discretionary act "involves a heightened amount of official judgment or discretion."). The *Frenz* Court held that "[f]loor maintenance is janitorial work involving routine, everyday matters" rather than "'policy-making, planning, or enforcement powers.'" *Frenz* at ¶ 23, quoting R.C. 2744.03(A)(3).

{¶ 42} The *Frenz* Court also addressed R.C. 2744.03(A)(5), holding that it likewise "relates to activities that require the balancing of alternatives or making decisions involving a heightened amount of official judgment or discretion." *Frenz* at ¶ 25, citing *Inland Prods., Inc. v. Columbus*, 2011-Ohio-2046, ¶ 62 (10th Dist.). In *Frenz*, this court further held that "[d]iscretion, in reference to R.C. 2744.03(A)(5), involves the exercise of independent judgment and policymaking." *Frenz* at ¶ 25, citing *Hacker v. Cincinnati*, 130 Ohio App.3d 764, 770 (1st Dist. 1998). "'[R]outine decisions requiring little judgment or discretion and that, instead, portray inadvertence, inattention, or unobservance, are not covered by the defense provided by R.C. 2744.03(A)(5).'" *Frenz* at ¶ 25, quoting *Hubbell v. Xenia*, 2008-Ohio-490, ¶ 22 (2d Dist.).

{¶ 43} Consistent with its finding under R.C. 2744.03(A)(3), the *Frenz* Court reiterated that "[d]ecisions concerning maintenance of the ballroom floor do not involve policymaking or a high degree of discretion, and therefore, the affirmative defense contained in R.C. 2744.03(A)(5), likewise, does not apply to this case." *Frenz* at ¶ 26. *See also Ohio Bell Tel. Co. v. Cleveland*, 2013-Ohio-270, ¶ 14 (8th Dist.) ("[A] political subdivision cannot simply assert that all of its decisions are 'discretionary' in order to obtain protection under R.C. 2744.03(A)(5).").

{¶ 44} We therefore reject GCRTA's claim that either R.C. 2744.03(A)(3) or (A)(5) restore immunity in this case. Next, we consider whether genuine issues of material fact exist with respect to the allegedly negligent operation of the bus on which appellant was riding.

**D. Negligence**

{¶ 45} GCRTA is a common carrier. "A common carrier's duty is to 'exercise the highest degree of care for the safety of its passengers consistent with the practical operation of its business.'" *Hopkins v. Greater Cleveland Regional Transit Auth.*, 2019-Ohio-2440, ¶ 13 (8th Dist.), quoting *Petrasek v. TC3 Operations, Inc.*, 2011-Ohio-1962, ¶ 24 (8th Dist.), citing *Bodley v. U.S. Air, Inc.*, 1997 Ohio App. LEXIS 5608 (10th Dist. Dec. 9, 1997). *See also Williams v. Greater Cleveland Regional Transit Auth.*, 2006-Ohio-3157, ¶ 17 (8th Dist.).

{¶ 46} A common carrier, however, "is not an insurer of the safety of its passengers," and its duties "only apply to perils that passengers should not be expected to discover or protect themselves against." *Hopkins* at ¶ 14, citing *Dietrich v. Community Traction Co.*, 1 Ohio St.2d 38, 43 (1964). *See also Williams* at ¶ 17. "'Reference must always be given to the surrounding circumstances when determining whether, as a matter of law, the common carrier exercised the highest degree of care toward the passenger.'" *Hopkins* at ¶ 14, quoting *Banks v. Greater Cleveland Regional Transit Auth.*, 1997 Ohio App. LEXIS 4868, *2 (8th Dist. Nov. 6, 1997), citing *Cleveland Ry. Co. v. Featherstone*, 1930 Ohio Misc. LEXIS 970 (8th Dist. June 23, 1930). In other words, "[i]n judging whether or not the [common carrier] exercised the highest degree of care toward [a] plaintiff, reference must be had to the surrounding circumstances." *Williams* at ¶ 18, citing *Rahman v. Greater Cleveland Regional Transit Auth.*, 1994 Ohio App. LEXIS 2379 (8th Dist. June 2, 1994).

{¶ 47} GCRTA believes that "[t]his is a simple, open/obvious, premise[s] liability case." (GCRTA brief at p. 40.) It emphasizes that appellant's fall occurred during a Cleveland winter, that there was melted snow on the bus floor, and that appellant not only should have seen the wet floor but actually admitted he saw it. Because those facts are undisputed, GCRTA urges us to view this case through the lens of the open-and-obvious doctrine. That doctrine "relates to the threshold issue of duty in a negligence action." *Hopkins* at ¶ 15. When it applies, "it obviates the duty to warn and acts as a complete bar to recovery." *Id*. GCRTA argues that the hazard was open and obvious and that constantly swabbing the decks (as GCRTA puts it) during the winter, while trying to remain on schedule, would not be consistent with the practical operation of its business.

{¶ 48} We agree that GCRTA cannot reasonably be expected to mop the floor at every stop, and we acknowledge that the 2019 *Hopkins* case (which involved plaintiff-appellant Fatiha Hopkins) applied the open-and-obvious doctrine to a fall on a bus. The *Hopkins* Court's invocation of the open-and-obvious doctrine outside the context of premises liability, however, appears to be an outlier. We have found no other cases explicitly applying the open-and-obvious doctrine in cases involving carrying passengers for hire, i.e., falls by passengers on transit vehicles. Indeed, three of the key cases the *Hopkins* Court relied upon, *Rahman*, *Fixel v. Greater Cleveland Regional Transit Auth.*, 1995 Ohio App. LEXIS 74 (8th Dist. Jan. 12, 1995), and *Jones v. Youngstown Mun. Ry. Co.*, 133 Ohio St. 118 (1937), specifically applied the common carrier duty standard and never mentioned the open-and-

obvious doctrine. Even if we assume the 2019 *Hopkins* case correctly applied the open-and-obvious doctrine to falls while carrying passengers for hire, however, in the present case, appellant's contentions are not limited to the condition of the bus floor. Specifically, while appellant includes an allegation that the wet bus floor contributed to his fall, his allegations are not limited to that static condition. From the outset, including in both his original and refiled complaints, he has alleged that the driver of the bus was actively negligent — not in failing to swab the deck, but in the way she operated the vehicle. As appellant puts it in his reply brief, "[b]y focusing exclusively on the fact that the aisle was wet was 'open and obvious,' GCRTA seems to advance the novel legal theory that it doesn't matter how its drivers operate its buses or whether its drivers observe traffic laws, as long as its passengers are aware that the floors are wet." (Appellant reply at p. 2.) We find merit to appellant's argument. Here, the allegation of a dynamic condition — the active negligence of the driver in the manner she operated the vehicle — takes the open-and-obvious doctrine off the table.

{¶ 49} "In applying the open and obvious doctrine, courts consider whether a hazard is *static* or *dynamic* because the open-and-obvious doctrine only applies to static conditions." (Emphasis added.) *Johnson v. Cleveland Metro. School Dist.*, 2025-Ohio-5852, ¶ 28 (8th Dist.). As this court explained in *Johnson*:

> "The distinction between static and dynamic forms of negligence is legally significant, because it directly correlates to the two separate and distinct duties an occupier owes its business invitees: (1) static conditions relate to the owner's duty to maintain its premises in a reasonably safe condition, while (2) active negligence relates to the

owner's duty not to injure its invitees by negligent activities conducted on the premises."

*Id.*, quoting *Goodman v. Orlando Baking Co.*, 2012-Ohio-1356, ¶ 16 (8th Dist.). The open-and-obvious doctrine does not apply where the harm arose from "a dynamic condition." *Johnson* at ¶ 30.

{¶ 50} In that regard, this case bears some resemblance to S*immons v. Am. Pacific Ents., LLC*, 2005-Ohio-6957 (10th Dist.), in which the Tenth District addressed the distinction between static conditions and active negligence. In that case, Simmons, a freight delivery driver, fell into a gap left by the removal of a dock plate. An APE employee had positioned the dock plate for the purpose of unloading APE's items from his vehicle. After completing the delivery of APE's goods, Simmons began rearranging other items in his truck to prepare for his next stop. He stepped backwards without looking behind him, assuming the dock plate was still in position. It had in fact been removed. Simmons did not hear or see the plate being removed but admitted that "he never turned to look behind him" and that "if he had turned around or walked facing forward, he would have noticed the absent dock plate and the gap that caused his injury." *Id.* at ¶ 2. The trial court granted summary judgment to APE based on the open-and-obvious doctrine. It found the gap open and obvious as a matter of law, noting that Simmons had "acknowledged that he would have seen the gap had he turned and looked." *Id.* at ¶ 22.

{¶ 51} On appeal, the Simmons argued that "the evidence presents a jury question of whether APE's negligence is absolved by the open and obvious doctrine" because "APE committed an active form of negligence through its employee's

actions, not a passive form of negligence through a pre-existing static hazard to which the doctrine applies." *Id*. at ¶ 19. The Tenth District agreed and reversed the trial court's grant of APE's motion for summary judgment:

> Premises tort claims where the alleged negligence arises from static or passive conditions, such as preexisting latent defects, are legally distinct from claims averring active negligence by act or omission.
>
> . . .
>
> Plaintiffs' negligence claim . . . was not predicated solely on a failure to warn of a pre-existing static hazard; plaintiffs allege that Brahimi negligently removed the dock plate while Simmons was still in the process of unloading freight. The evidence of record in fact demonstrates that Brahimi removed the dock plate sometime before Simmons' injury, thus creating an issue of fact concerning Brahimi's actions and whether they constitute an act of negligence to which the open and obvious doctrine would not apply. While the amount of time elapsing between Brahimi's act and Simmons' injury may be significant in determining whether Brahimi's action had become a static condition on the premises, *the record evidence makes sufficiently clear that when the facts are construed in a light most favorable to plaintiffs, reasonable minds could find that Brahimi's active conduct caused Simmons' injury, thus rendering the open and obvious doctrine inapplicable.*
>
> . . .
>
> [A] premises occupier's liability can arise under a static form of negligence through a failure to warn its invitees of a latent or hidden defect on the premises. Alternatively, it can arise from a dynamic form of negligence if its invitee is injured by its own act or by activities conducted on the premises. Because genuine issues remain whether Simmons was injured by a dynamic or static condition on the premises, and because the open and obvious doctrine only applies to static conditions, the trial court erred in granting summary judgment in favor of APE.

(Emphasis added.) *Id*. at ¶ 17 and 22-23.

{¶ 52} The present case, like *Simmons*, does not involve a mere static condition, i.e., the wet floor. Appellant also alleged in his complaint that GCRTA's driver "was negligent in *operating the bus at an excessive rate of speed* and *failing to safely bring the bus to a stop* when they knew or should have known that [appellant] was attempting to exit the bus and that the aisle was wet and slippery." (Emphasis added.) (Complaint at ¶ 5.) Appellant acknowledged at his deposition that he knew the floor was slippery, but he testified that he had never previously slipped while a bus was stopping and that the reason he slipped was "because the driver was going at a high rate of speed, probably faster than she should have been considering that I had signaled for a stop." (Appellant dep. at 24.)

{¶ 53} In response to GCRTA's motion for summary judgment, appellant also submitted an affidavit contending that "the driver suddenly and forcefully applied the brakes, bringing the speeding bus to an unusually sudden, forceful and violent stop." (Appellant aff. at ¶ 10.) We do not agree with GCRTA that this is a sham affidavit that conflicts with his deposition testimony. We acknowledge that under settled precedent, "[a] party cannot create a genuine issue of material fact to defeat summary judgment simply by submitting a self-serving affidavit that *contradicts* other facts and evidence in the record." (Emphasis added.) *Mobley v. James*, 2020-Ohio-380, ¶ 43 (8th Dist.). Here, however, there is no contradiction. The affidavit is both consistent with appellant's theory of the case as framed in his complaint and does not contradict his sworn deposition testimony. Appellant's statement at deposition (that the bus was speeding) and the statement in his

affidavit (that the bus came to an unusually sudden and violent stop) are not inconsistent; they can both be true at the same time.

{¶ 54} Instead, the affidavit fills a gap left by GCRTA's hyperfocused cross-examination. As we discussed in the factual summary above, GCRTA leaned so heavily into its open-and-obvious theory during appellant's deposition that, despite the clear allegation in the complaint that the driver failed to safely bring the bus to a stop, it did not ask appellant any questions about the manner in which the bus came to a stop: It did not ask appellant whether the bus came to a sudden stop in this instance, whether anything was unusual or violent about the way the bus stopped, or anything else about the stop itself. This bears little resemblance to the deposition/affidavit conflict described in *Davis v. Snack Shack (Open Pantry)*, 2019-Ohio-1887, ¶ 27 (8th Dist.), a premises liability case in which the plaintiff's "averment [in her affidavit] that an employee informed her that 'the water was coming from the cooler and it had been doing that for some period of time, [was] in stark contrast to her deposition testimony that she did not know what the liquid was or how it got on the floor." *See also Barton v. Cty. of Cuyahoga*, 2020-Ohio-6994, ¶ 30 (8th Dist.) (affidavit conflicted with deposition testimony where Barton stated in affidavit that he met in person with former county prosecutor but testified at deposition that he never met with the prosecutor).

{¶ 55} In addition, appellant's affidavit was not impermissibly self-serving. Not only did it not contradict his sworn deposition testimony, but it was also corroborated by outside materials, i.e., the testimony of his engineering expert and

the surveillance video.  *See Amin, Turocy & Watson LLP v. Just Funky LLC*, 2024-Ohio-1368, ¶ 26 (8th Dist.).  It also did not consist of ""bare contradictions of the evidence offered by the moving party.""  *Goldfarb v. Cuyahoga Cty.*, 2025-Ohio-3283, ¶ 33 (8th Dist.), quoting *Jochum v. Listati*, 2019-Ohio-166, ¶ 19 (8th Dist.), quoting *Davis v. Cleveland*, 2004-Ohio-6621, ¶ 23 (8th Dist.), quoting *Bell v. Beightler*, 2003-Ohio-88, ¶ 33 (10th Dist.).  This is principally because GCRTA became so entrenched in its open-and-obvious theory of the case that it essentially offered no evidence regarding the speed of the bus or whether it came to an unusually sudden, forceful, and violent stop.

{¶ 56} Appellant alleged in his affidavit that the bus came to an unusually sudden, forceful and violent stop.  Not only does this not contradict his deposition, it also fits neatly into the line of cases involving a "jerk," or abrupt start or stop, on public transit.  In *Yager v. Marshall*, 129 Ohio St. 584, 585 (1935), a passenger slipped while riding on a street car.  The Ohio Supreme Court rejected the notion that the mere occurrence of abrupt movement was sufficient to demonstrate negligence.  Instead, "to prove such negligence there must be evidence indicating a jerk *unusual* in some respect such as in its suddenness, force or violence." (Emphasis added.)  *Id.* at paragraph two of the syllabus.  Accordingly, "[w]here . . . the stopping of a common carrier's vehicle is due to an unusual, sudden, and violent jerk,'" an inference of negligence arises."  (Cleaned up.)  *Hughes v. S.W. Ohio Regional Transit Auth.*, 2024-Ohio-1048, ¶ 15 (1st Dist.).  In *Cranon v. Toledo Area Regional Transit Auth.*, 1988 Ohio App. LEXIS 815 (6th Dist. Mar. 11, 1988), the

plaintiff was injured when the bus driver suddenly slammed on the bus's brakes. The Sixth District, citing this court's decision in *Featherstone v. Cleveland R. Co.*, 32 Ohio App. 93 (8th Dist. 1929), found that there was an issue of fact regarding whether the bus driver was negligent in braking suddenly.

{¶ 57} Several courts have rejected sudden-jerk or sudden-stop claims, however, where the plaintiff failed to demonstrate the abrupt action was unusual. In *Piccirillo v. S.W. Ohio Regional Transit Auth.*, 2013-Ohio-2289, ¶ 3 (1st Dist.), the plaintiff claimed she had been "jolted a little bit when [she] turned to sit down" and therefore "missed the seat." *Id.* at ¶ 5. Unlike the present case, however, Southwest Regional Transit Authority ("SORTA") asked the plaintiff at deposition whether the movement of the bus had been unusual: "When asked whether there was anything different about the way the bus had pulled away from the stop, Ms. Piccirillo responded, 'It wasn't unusual. I know the bus moved, and that's all I know.'" *Id.* at ¶ 5. The First District upheld the grant of summary judgment in favor of SORTA. Distinguishing *Cranon*, it found that "[h]ere, in contrast, no evidence was presented that the bus's movement was '*unusual* in some respect such as in its suddenness, force or violence.'" (Emphasis added.) *Id.* at ¶ 6, quoting *Yager* at paragraph two of the syllabus.

{¶ 58} In *Neighbarger v. Cent. Ohio Transit Auth.*, 9 Ohio App.3d 83 (10th Dist. 1982), the Tenth District likewise cited *Yager* for the proposition that "the mere occurrence of jerking in the operation of the carrier, absent evidence of an unusual suddenness, force, or violence, is not evidence of negligence." *Id.* at 84. The Tenth

District upheld the grant of summary judgment for the transit authority based on *Yager* because "[t]he deposition of appellant produced no evidence that said lurching or jerking was of *unusual* suddenness, force, or violence." (Emphasis added.) *Id*. at 84.

{¶ 59} The present matter is distinguishable from cases such *Piccirillo* and *Neighbarger*, where the plaintiffs failed to offer evidence of unusual movement. Appellant stated in his affidavit that the driver stopped the bus in an unusually sudden and violent manner.

{¶ 60} GCRTA's citation to *Merchant v. RTA Miami Valley Regional Transit Auth*., 1998 Ohio App. LEXIS 692 (2d Dist. Feb. 27, 1998), is unavailing. In that case, injured plaintiff Conley and her guardian, Merchant, asked the court "to infer that the jerking movement was unusual from the fact that she fell." *Id*. at *4. The Second District found that the plaintiffs failed to present "any evidence to show that the bus'[s] acceleration was faster or more forceful than normal" and that "[w]ithout such evidence, Plaintiffs cannot prove any breach of duty." *Id*. at *4-5. In short, "[i]n order to prove such negligence, there must be evidence indicating a jerk unusual in some respect such as in its suddenness, force, or violence." *Id*. at *5-6, citing *Yager*, 129 Ohio St. at 587. Conley was asked at deposition whether there was "a quick acceleration or just a normal acceleration." She answered, "I don't know." *Id*. at *6. Asked if it was "fair to say" that it was "just a normal acceleration," she responded that she "didn't know what it was. It just pulled off." *Id*. at *6. The court wrote:

Conley and Merchant apparently concede that neither of them described any unusual suddenness, force, or violence in the movement of the bus, and such a concession is supported by the above quoted testimony. Conley testified that "the bus driver pulled off and I fell." When pressed for additional details, Conley was unable to provide any, stating that she did not know if the bus had accelerated quickly or normally, and reiterating that the bus had "just pulled off." Similarly, Conley's grandmother testified that Conley had told her that "she had walked near to the rear of the bus, but before she could sit down, the bus started off and she fell." This testimony does not create a genuine issue of material fact as to whether the bus's movement was unusually sudden, forceful, or violent.

*Id.* at *7-8. Appellant here does not simply ask that the court infer that the bus's movement was unusual based on the fact that he fell. He specifically averred that the stop was unusually sudden, forceful, and violent.

{¶ 61} Another case cited by GCRTA, *Moore v. W. Res. Transit Auth.*, 2005-Ohio-6794 (7th Dist.), likewise fails to support its position. Similar to the present case, "[i]n her deposition, Moore denied that she slipped due to wet conditions, laying blame solely on the manner in which the bus started moving." *Id.* at ¶ 11. The Seventh District, upholding a grant of summary judgment in favor of the transit authority, found that "the evidence Moore relies upon to establish the unusual nature of the bus's jerk actually describes the nature of her fall, not the unusual manner in which the bus jerked." *Id.* at ¶ 11. More specifically, when "asked whether the bus's movement was different than the norm, she replied that it pulled out in 'pretty much the usual way' and denied that there was anything 'unusual or different or strange about the way the bus pulled away from the intersection.'" *Id.* at ¶ 11. The court held:

In this case, Moore laid total blame for her injury on the manner in which the bus started moving, but she testified that the bus started in the normal manner. The only evidence she can point to is not evidence of the manner in which the bus moved; rather it is evidence of the nature of her fall. Without evidence that the bus jerked in an unusual way, Moore cannot prove her case against WRTA. Accordingly, there is not a genuine issue regarding whether WRTA breached its duty of care, and the trial court properly granted summary judgment to WRTA.

*Id.* at ¶ 12.

{¶ 62} GCRTA cites *Leiby v. Camper*, 1989 Ohio App. LEXIS 3100 (6th Dist. Aug. 11, 1989), for the proposition that "[a]cceleration and slowing are normal aspects of operating any motorized vehicle." *Id.* at *5. That case involved decedent Leonard F. Camper's fall from a tractor driven by his son, Leonard Camper, Jr. A corn planter was affixed to the tractor by means of the tractor's draw bar. Camper Sr. was seated on the tractor's draw bar while Camper Jr. drove it on a roadway. Camper Jr. slowed to allow traffic to pass, then accelerated. Camper Sr. "slipped off the draw bar," "fell under the corn planter," and died the same day. *Id.* at *1. Camper Jr. prevailed on summary judgment. As GCRTA notes, the case stands for the proposition that moving vehicles must, by their nature, both accelerate and slow. Accordingly, the *Leiby* Court did not find the fact that Camper Jr. "accelerated just before his father slipped to be, in and of itself, evidence of negligence." *Id.* at *5. The opinion, however, goes on to state that "[i]t is only when such acceleration results in the *erratic operation of a vehicle* that a negligent act can be said to have occurred." (Emphasis added.) *Id.* at *5. The court found no evidence of erratic operation. Camper Jr. had testified in both his deposition and in an affidavit that he

did not operate the tractor in an erratic manner, and there was no evidence to the contrary.

{¶ 63} In the present case, unlike *Leiby*, appellant alleged what could be termed erratic operation of the vehicle. While acceleration and slowing are indeed normal aspects of a vehicle's operation, appellant alleged both that the driver was speeding and that the bus came to an unusually sudden and violent stop. These specific allegations also distinguish the present case from *Moore*, where the plaintiff, unlike here, was specifically asked at deposition if the bus moved differently than usual and answered that it had not moved in any way that was "'unusual or different or strange.'" *Moore* at ¶ 11. Appellant's allegations also serve to distinguish this case from *Merchant*, 1998 Ohio App. LEXIS 692 (2d Dist. Feb. 27, 1998), where the party who fell responded to specific deposition questions about the nature of the bus's movement by testifying that the bus "just pulled off" and that she could not say whether its movement was unusual. *Merchant* at *8.

{¶ 64} Viewing the evidence most strongly in favor of the nonmoving party, therefore, appellant's record evidence demonstrates the existence of a genuine issue of material fact for trial. The video footage indicates appellant fell while the bus was stopping, and unlike the plaintiffs in cases such as *Merchant*, *Moore*, *Neighbarger*, or *Piccirillo*, appellant stated in his affidavit that the bus's movement was unusual, i.e., that the bus came to an unusually sudden and violent stop.

{¶ 65} GCRTA's efforts to refute appellant's allegation simply highlight the disputed factual issues. For example, GCRTA points to an untethered garbage

receptacle, visible in the surveillance video, that remains stationary throughout the deceleration. It argues that the lack of movement proves the stop was neither sudden nor violent. Nothing in the record, however, reveals what was in the receptacle. Perhaps it was empty and light as a feather, as GCRTA suggests. Then again, maybe not.[2]

{¶ 66} In addition, the trash bin was not on a wet surface. Again, while appellant alleges active negligence by the driver, he contends not only was the stop unusually forceful and violent, but that both the excessive speed and the unusual violence of the stop were particularly egregious given the condition of the floor. Through the deposition of a corporate representative, appellant established that GCRTA "ask[s] drivers to be extra cautious in inclement weather" not only because navigating the roads presents challenges but because the "[f]loors can get wet" and "slippery." (Draper dep. at 49.) In any event, apart from the wet floor, the unusualness, suddenness, and violence of the stop are factual issues for a jury based on appellant's unrebutted testimony.

{¶ 67} As noted above, appellant further testified that prior to coming to a halt the bus had been speeding. "Lay witnesses are routinely permitted to testify regarding the rate of speed a motor vehicle traveling that is based on their personal observation." *Johnson v. Greater Cleveland Regional Transit Auth.*, 2021-Ohio-

---

[2] On the other hand, we find no value to appellant's contention that the video demonstrates the bus was speeding by virtue of the mere fact that it passes multiple vehicles as it approached appellant's stop. Just as the record reveals nothing about what might have been in the trash bin, it is likewise silent as to the speed of surrounding vehicles.

938, ¶ 78 (8th Dist.), citing *State v. Urbina*, 2016-Ohio-7009, ¶ 52 (10th Dist.). *See also State v. McKee*, 91 Ohio St.3d 292, 296 (2001) ("Evid.R. 701 contemplated testimony about such ordinary things as . . . speed[.]"). Plaintiff's expert witness Ellis likewise testified that the bus was exceeding the speed limit during the relevant time period.[3] The GCRTA operator handbook instructs drivers to obey posted speed limits. In addition, GCRTA witness Draper testified that it was not acceptable for a bus operator to operate a bus in excess of a posted speed limit and that GCRTA drivers "are taught to follow the laws and follow speed limits." (Draper dep. at 34.) While the violation of a departmental policy might be insufficient to establish willful, wanton, or reckless conduct, it "'may be relevant to determining the culpability of a course of conduct.'" *Johnson* at ¶ 106, quoting *Anderson v. Massillon*, 2012-Ohio-5711, ¶ 37. In *O'Toole v. Denihan*, 2008-Ohio-2574, a case where immunity status turned on allegation of recklessness, the Ohio Supreme Court found that "evidence that policies have been violated demonstrates negligence at best." *Id*. at ¶ 92. In the present case, negligence is all appellant needs.

---

[3] We find no merit to GCRTA's argument that Ellis's testimony must be excluded pursuant to Evid.R. 702. Ellis testified as to her engineering educational background and other qualifications that allowed her to offer expert testimony regarding the speed of the bus. She described the methodology she used to calculate the average speed of the bus during the relevant time period, establishing the procedures that permitted more accurate calculations than a lay person might perform, i.e., using video footage overlaid with map data to determine distance over time. GCRTA's argument that her testimony is not scientifically reliable because the endpoint of her testimony (expressed to a reasonable degree of engineering certainty) was a range of averages or otherwise insufficiently precise goes to weight rather than admissibility.

{¶ 68} We acknowledge the line of cases holding that a transit vehicle's unusually sudden and violent stop may not qualify as negligence because of exigent circumstances. In other words, "proof that 'such a stop was necessary to avoid some unexpected emergency for which the defendant was not responsible' can rebut this inference of negligence." *Hughes*, 2024-Ohio-1048, at ¶ 15 (1st Dist.), citing *Stowe*, 2005-Ohio-4431, at ¶ 23 (6th Dist.), quoting *Stine*, 106 Ohio App. at 431 (2d Dist. 1958). In *Hughes*, SORTA produced evidence, including video, demonstrating that the driver had been cut off in traffic and had to brake hard to avoid a collision. *Hughes* at ¶ 16-17. The plaintiff, however, failed to satisfy her reciprocal burden. She "introduced no evidence and made no argument that it was not necessary for Howard to brake to avoid a collision." *Id*. at ¶ 20. The First District therefore upheld the grant of summary judgment in favor of SORTA.

{¶ 69} The *Hughes* Court discussed *Stowe* extensively. In *Stowe*, the plaintiff alleged he was injured when a bus "suddenly stopped and he was thrown from his seat." *Hughes* at ¶ 22, citing *Stowe* at ¶ 3-4. Toledo Area Regional Transit Authority ("TARTA") moved for summary judgment. It essentially conceded the sudden stop but argued "that it was not liable because the sudden stop was necessary to avoid a collision and because there was no evidence that the driver was negligent." *Hughes* at ¶ 22, citing *Stowe* at ¶ 7-8. The Sixth District found:

> "TARTA rebutted any inference of negligence by showing that [the bus driver] was required to stop abruptly because an automobile cut in front of the bus and made a right turn. Appellant's deposition testimony and affidavit were insufficient to create a genuine issue of material fact on the question of whether [the bus driver] was required

to make that emergency stop. In particular, appellant's testimony, when viewed in its entirety, does not create a question of material fact on the issue of whether a car cut in front of the TARTA bus. Thus, appellant failed to offer proof showing negligent conduct, and the trial court did not err in granting summary judgment to TARTA as a matter of law."

*Hughes* at ¶ 24, quoting *Stowe* at ¶ 24.

{¶ 70} In the present case, GCRTA has not rebutted the inference of negligence that arises from the unusually sudden, violent stop. For example, unlike in *Hughes* and *Stowe*, it has not argued that the driver was faced with an emergency requiring an unusual, sudden stop. The video does not reveal that the mechanics of the stop were influenced by a jaywalker, another carelessly operated vehicle, or any other outside factor. We therefore find this line of cases inapplicable.

{¶ 71} Finally, we reject GCRTA's argument that it was entitled to summary judgment because the physician it hired to examine appellant opined that there was insufficient medical evidence to causally relate appellant's fall to a quadriceps tear. (GCRTA brief at p. 32-33.) As discussed above, appellant produced a medical expert, his treating orthopedic surgeon, who testified that it was his "opinion with a reasonable degree of medical certainty that [appellant] injured his right lower extremity when he fell on January 17th [sic], 2019," more specifically, that appellant "sustained a quadriceps tendon tear as a direct and proximate result of the fall and the injury." (Mandel dep. at 26.) GCRTA does not explain how its retention of a competing expert would entitle it to summary judgment based on causation.

{¶ 72} Viewing the evidence most strongly in favor of the nonmoving party, we conclude that appellant has demonstrated the existence of genuine issues of

material fact for trial, i.e., whether his fall on a wet surface resulted from an unusually sudden, forceful, or violent stop.  Accordingly, we reverse.

{¶ 73} Judgment reversed, and case remanded for further proceedings.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
DEENA R. CALABRESE, JUDGE

SEAN C. GALLAGHER, P.J., and
EILEEN A. GALLAGHER, J., CONCUR